Argued and submitted April 6, the decision of the Court of Appeals and the judgment of the circuit court affirmed August 8, 1989

## UTILITY EQUIPMENT, INC.,
*Petitioner on Review,*

*v.*

## MORBARK INDUSTRIES, INC.,
*Respondent on Review.*

(TC A8411-06465; CA A41674; SC S35745)

779 P2d 139

Christopher James, Portland, argued the cause for petitioner on review. With him on the petition were Christopher James, P.C., and Richard A. Weill, Portland.

Linda M. Seluzicki, Portland, argued the cause for respondent on review. With her on the response to the petition were Glen McClendon and Rick T. Haselton, Lindsay, Hart, Neil, Weigler, Portland.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

We granted review in this contract case to determine whether a manufacturer's warranty to "replace" a defective part of its product necessarily includes labor costs incurred in replacing the defective part. We conclude that where, as here, the warranty is silent as to who pays labor costs, the question is for the trier of fact to determine.

### I.

Plaintiff, Utility Equipment, Inc. (Utility), is an Oregon company that buys heavy equipment from manufacturers and leases or sells that equipment to others. Defendant, Morbark Industries, Inc. (Morbark), is a Michigan-based company which manufactures and sells a variety of forest product related equipment. Among its products is the Eeger Beever Chipper, a portable machine that grinds and mulches trees and brush.

Utility brought this action to recover labor costs it incurred in replacing parts in a number of chippers sold to it by Morbark. The trial court granted Morbark partial summary judgment on Utility's claims for breach of implied warranties of merchantability and of fitness for a particular purpose, negligence, and statutory damages under the National Traffic and Motor Vehicle Safety Act, 15 USC § 1381 *et seq.* After trial on Utility's remaining claims, the jury found against Utility on its claims for breach of express warranty and *quantum meruit,* and in favor of Utility on its claim for indemnity.

Utility appealed, contending that the trial court erred in granting Morbark's motion for partial summary judgment as to Utility's implied warranty, negligence, and motor vehicle safety act claims, in denying Utility's motion for a directed verdict on Utility's breach of express warranty claim, and in instructing the jury. The Court of Appeals affirmed the trial court's judgment. *Utility Equipment v. Morbark Industries,* 93 Or App 489, 763 P2d 164 (1988). We affirm.

### II.

In November 1981, the parties agreed orally that Utility would act as a distributor for Morbark's chippers. There was no blanket dealer agreement between Morbark and

Utility. A written agreement submitted to Utility by Morbark was not signed by Utility. Utility purchased each chipper from Morbark under a separate written contract for each purchase. Utility was under no obligation to buy any chippers. Between November 1981 and February 1982, Utility purchased two chippers. During this time, the parties communicated with each other about the scope of Morbark's chipper warranty.

On November 10, 1981, Morbark sent Utility a packet of information including warranty forms and an explanation of Morbark's warranty policies and procedures. Included was a document entitled "Morbark Eeger Beever Warranty," which stated in part:

> "Morbark Industries, hereinafter referred to as 'Manufacturer' warrants each new Eeger Beever Chipper to be free from defects in material and workmanship under normal use and service for a period of one (1) year or 2,000 hours, whichever comes first, after the date of delivery to the original retail purchaser. Manufacturer will at its option replace or repair at a point designated by the manufacturer, any part or parts which shall appear, to the satisfaction of the Manufacturer upon inspection, to have been defective in material or workmanship.
>
> "* * * * *
>
> "This Warranty is expressly in lieu of any other Warranties, express or implied, including any implied Warranty of merchantability or fitness for a particular purpose and of any non-contractual liabilities including product liabilities, based upon negligence or strict liability. Morbark Industries, Inc. does not authorize any person to create any other obligation or liability in connection with its products. Morbark Industries, Inc. will not be liable for consequential damages resulting from breach of warranty."

This warranty also was provided to Utility and to its retail customers with each individual chipper sale.

In February 1982, Morbark wrote to Utility explaining Morbark's warranty coverage. Enclosed was a copy of Morbark's April 1981 service bulletin regarding warranty regulations, which stated in part:

> "This Bark Bulletin is to serve as a reminder for service, parts and sales areas of the Eeger Beever units. Accompanied with this Bark Bulletin is a copy of the warranty covering this machine. Material and workmanship of the components are

covered under warranty, but *NOT* labor, travel time or serviceman's expenses. At your own discretion, I would advise that this leaves you with three options:

"1.   Absorb the labor yourself.

"2.   Do the work and invoice the customer for the labor.

"3.   Advise the customer to do his own labor in most cases.

"As you know on a piece rate basis, this product is a low profit item for both of us, and labor costs can eat up the profit rather quickly.

"In cases where a major manufacturing defect results in excessive expense being incurred by your Service Department, Morbark Industries will reimburse you for all or part of this expense, *IF WRITTEN APPROVAL* is obtained by the Morbark Eeger Beever Product Manager. This written approval must then accompany your warranty claim being submitted for reimbursement." (Emphasis in original.)

At trial, Utility's president testified that he was aware in early 1982 that Morbark took the position that labor costs were *not* included in its chipper warranty. Also, Morbark offered evidence that its exclusion of labor costs was consistent with standard industry practice. Knowing that Morbark interpreted its chipper warranty as not covering labor, Utility continued to buy chippers from Morbark. In 1982 and 1983, Utility purchased 38 chippers. Utility ordered all but two of the 38 chippers after having received Morbark's explanatory materials.

In April 1983, Morbark issued an "Urgent Safety Alert" to its customers and dealers advising them that a small number of chippers had developed stress cracking in the fan blades or chipper disc[1] and that once this cracking had occurred, operation of the chipper was extremely dangerous. The "Urgent Safety Alert" stated in part:

"We are making immediate arrangements to send Morbark servicemen out to our dealer locations to work with our dealers in repairing any machine with stress cracks and to retrofit those machines with paddle style fan blades or welded hub or knife pockets. Your local dealer will contact you shortly to

---

[1] Morbark's witness described the chipper disc as "a flywheel design, 37-and-a-half inches diameter, weighs about 400 pounds with the hardware and knives and shaft and hub."

schedule a time when your machine can be brought into his shop for repair. *Once again, if your machine actually has stress cracks, do not run it again, and contact Morbark or your local dealer immediately to arrange for repair.* If all your machine requires is the pin and clamp kit for the hood, we will mail that to you. Each customer can easily install that kit themselves rather than go through the inconvenience of bringing your machine into your dealer's shop.

"We sincerely regret the inconvenience that this may cause you; however, our overriding concern is for the safety of our equipment user. Once these necessary repairs are made, you should once again enjoy the safe and trouble free operation of the best chipper of its size on the market today. Naturally all repairs will be made at Morbark's expense at no charge to you, our valued customer. Thank you for working with us to resolve these problems." (Emphasis in original.)

In May 1983, Morbark issued a "Safety Alert Update" to its customers and dealers, stating in part:

"[A]fter further evaluation, * * * we have decided to replace the chipper disc of each Eeger Beever manufactured up through Serial Number 648 with our new style disc, which includes the new style fan blades. * * *

"Morbark will ship, at its expense to a location of your choice, a new chipper disc (including the shaft and fan blades) to replace the old disc in all machines through Serial Number 648. The enclosed 'Chipper Disc Replacement Instructions' explains in detail the steps to be followed in replacing a disc, and I am sure many customers will find they are capable of replacing the disc themselves. Other customers may determine that they want to pay a Morbark dealer or a local machine shop to handle this for them. Please complete and return to us the enclosed 'Customer's Shipping Instructions' to inform us of the location to which to ship your replacement disc. Morbark's standard warranty is limited to one year and covers replacement of defective parts only (labor and shipping costs are not covered under warranty) upon return to Morbark of the defective part. In this situation, however, Morbark will waive its one year time limitation and will also bear the freight cost of shipping the new disc. To control the administrative process, customers will be billed $642.78, Morbark's normal retail selling price for the replacement disc, and also be supplied with a warranty form to be completed. Upon your return of the old disc (including fan blades, shaft, etc.) to Morbark's plant in Winn, Michigan, along with the completed warranty

claim, we will credit your account for the $642.78 originally billed. * * *"

At the same time, Morbark sent the following instructions to its chipper dealers:

"[W]e have decided to replace the chipper disc in each of the Eeger Beevers manufactured up through Serial Number 648 with our new style disc which includes the new style fan blades. We will also be providing a new hood lock assembly for the chipper hood as previously planned.

"Customers will be provided with detailed instructions on how to replace the chipper disc and install the hood lock assembly, and a number of customers will provide their own labor to do so. Many others will contact their Morbark dealer, or perhaps a local machine shop, to handle these adjustments. We are not asking our dealers to service customers for free, and the amount actually charged by you will be an individual matter to be determined between the dealer and customer in each case. We do expect that our dealers recognize the seriousness of the problem, and attempt to hold such service charges to the minimum. Chipper discs and hood lock assemblies will be shipped, at Morbark's cost, to a destination selected by the customer. We are expecting dealers to replace the disc and install the hood lock on any machine held in a dealer's inventory. Please advise us if you require a disc or hood lock for such inventory units. We are also asking for your help in working with us to return the old discs to Winn, along with a completed Morbark Warranty Claim, as discussed in the 'Safety Alert Update' so that dealer and customer accounts may be credited.

"Morbark is, at considerable cost, extending their terms of its normal warranty in providing all customers with a new disc, and shipping them at our cost. Customers must be made to understand that a disc is a replaceable item, and in the future will be subject to Morbark's standard warranty.

"We realize and regret that customers have been inconvenienced by this problem; however, they will wind up with an improved machine with an increased operating life for a relatively small cost. Hopefully the customer will recognize this. Much of the success of this replacement program rests upon how well our dealers work with customers in bringing this about. Some new discs have already been shipped, and the rest are now being manufactured and should be available shortly. Thank you for your continued cooperation."

Needless to say, most of Utility's chipper customers

were unhappy about the prospect of having to pay the labor costs incident to Morbark's disc replacement program. Utility therefore replaced some of its customers' discs free and then submitted claims to Morbark for reimbursement for labor. Utility also submitted claims for reimbursement for labor on Utility's own chippers and for labor costs incurred by Utility's customers who had fixed their own chippers. When Morbark rejected all claims for labor, Utility initiated this action. Utility's claim for $23,447 in labor costs incurred in repairing chippers included labor costs for work on its customers chippers, on Utility's own chippers, and for labor performed by Utility's customers for which Utility had not paid. The jury awarded Utility $2,219.89 on its indemnity claim.

## III.

### *Summary Judgment*

Utility first contends that the trial court erred in granting Morbark's motion for partial summary judgment as to Utility's implied warranty and negligence claims. Utility argues that the pleadings raised questions of fact as to whether the warranty applies to Utility at all and, if so, as to whether Utility may avoid the warranty's limitations on the ground of unconscionability or failure of essential purpose. *See* ORS 72.7190.[2]

■     Morbark's warranty expressly barred Utility's implied warranty and negligence claims:

---

[2] ORS 72.7190 provides:

"(1) Subject to the provision of subsections (2) and (3) of this section and of ORS 72.7180 on liquidation and limitations of damages:

"(a) The agreement may provide for remedies in addition to or in substitution for those provided in ORS 72.1010 to 72.7250 and may limit or alter the measure of damages recoverable under ORS 72.1010 to 72.7250, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

"(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

"[T]his Warranty is expressly in lieu of any other Warranties, express or implied, including any implied Warranty or [sic] merchantability of [sic] fitness for a particular purpose and of any non-contractual liabilities including product liabilities, based upon negligence or strict liability. * * * Morbark Industries, Inc. will not be liable for consequential damages resulting from breach of warranty."

Utility offers no persuasive explanation as to why it is not bound by the warranty's limitations or why it may avoid them on the grounds of unconscionability or failure of essential purpose. Therefore, the trial court did not err in granting Morbark's motion for partial summary judgment as to Utility's implied warranty and negligence claims.

■■■ Utility next argues that granting of partial summary judgment was error because the issue of the warranty's applicability to a "product recall" was a question of fact for the jury. Even assuming that Morbark's offer was a product recall, the Court of Appeals found nothing in the warranty language to indicate that the warranty would not apply to a product recall. The Court of Appeals stated that Utility had offered no evidence of any other agreement that the warranty's express exclusions would not apply to a product recall. *Utility Equipment v. Morbark Industries, supra,* 93 Or App at 494. We agree. Further, Utility does not explain how Morbark's offer to provide new discs for *all* chippers, including undamaged and out-of-warranty chippers, could expand Morbark's liability beyond what it otherwise would have been, nor why labeling Morbark's action a "product recall" would impose a new duty on Morbark independent of contract or statute. We adopt the Court of Appeals' analysis on these points and find no error.

■ Utility also argues that the trial court erred in granting Morbark summary judgment on Utility's motor vehicle safety act claim. That act, which provides a statutory remedy for motor vehicle defects relating to motor vehicle safety, defines "motor vehicle" as:

"[A]ny vehicle driven or drawn by mechanical power manufactured primarily for use on the public streets, roads, and highways, except any vehicle operated exclusively on a rail or rails." 15 USC § 1391(3) (1982).

Our review of the act and its legislative history compels us to

agree with the trial court that the act is not applicable because Morbark's chipper is not a vehicle "manufactured primarily for use on the public streets, roads, and highways." Therefore, the trial court did not err in granting summary judgment on Utility's motor vehicle safety act claim.

## Directed Verdict

■ Utility next contends that the trial court erred in denying its motion for a directed verdict on its breach of express warranty claim and in refusing to give its requested jury instruction that Morbark's express warranty included labor. Utility argues that Morbark's warranty to replace a defective part is unambiguous in that it necessarily includes the cost of labor. Utility argues further that where, as here, a part cannot be easily and cheaply replaced, merely supplying a new part for a defective part does not constitute "replacement." Stated differently, a defective part is not "replaced" if it is still in the machine, even if the customer is in possession of a new part. Utility predicts that under the Court of Appeals' holding, all "repair and replace" warranties will require resort to judicial intervention to determine whether labor is included.

A directed verdict for Utility would have been proper only if Morbark's warranty unambiguously provided that it covers the labor costs. It does not unambiguously so provide.[3] Morbark's warranty does not mention warranty labor. The warranty states in part:

> "Manufacturer will at its option replace or repair at a point designated by the manufacturer, any part or parts which shall appear, to the satisfaction of the Manufacturer upon inspection, to have been defective in material or workmanship."

That language could be interpreted as encompassing labor costs involved in replacing a defective part; on the other hand, it also could be interpreted as covering only "at the counter" replacement of defective parts, with labor costs to be borne by the chipper owner. The warranty's meaning, therefore, was a question of fact which was properly given to the jury. *See May v. Chicago Insurance Co.,* 260 Or 285, 292-94, 490 P2d 150

---

[3] Each party moved for directed verdict on the express warranty claim, asserting that the language "unambiguously" supported its version.

(1971); *see also* 3 Corbin On Contracts 26-28, § 536 (2d ed 1960).[4]

Alternatively, Utility argues that the trial court should have directed a verdict for it because Morbark's warranty provides for the costs of labor involved in manufacturing defects and because Morbark admitted that the disc problem was a manufacturing defect. We disagree. Morbark's warranty does not mention warranty labor. Further, in its April 1981 service bulletin, Morbark specifically advised its dealers, including Utility, that:

> "In cases where a major manufacturing defect results in excessive expense being incurred by your Service Department, Morbark Industries will reimburse you for all or part of this expense, *IF WRITTEN APPROVAL* is obtained by the Morbark Product Manager responsible for that particular product. This written approval must then accompany your warranty claim being submitted for reimbursement." (Emphasis in original.)

Morbark repeated substantially the same advice in its February 1982 letter to Utility. At most, this was Morbark's offer to indemnify its dealers, but only in the event that dealers incur "excessive" costs, and only when those costs result from a "major" manufacturing defect. Further, the requirement for Morbark's written approval prior to submission of a claim indicates that the decision as to whether costs are "excessive," whether a manufacturing defect is "major," and whether reimbursement will be full or partial falls within Morbark's discretion, subject, perhaps, only to Morbark's obligation to act in good faith. *See* ORS 71.2030.

We have examined Utility's other assignments of error and concur in the disposition of those assignments by the Court of Appeals.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed.

---

[4] Utility did not request a jury instruction that the warranty should be construed against Morbark, as the drafting party. *See Busto v. Manufacturers Life Ins. Co.,* 276 Or 707, 713, 556 P2d 96 (1976).