Argued October 26, affirmed December 1, petition for rehearing
denied December 29, 1971

ROLFE ET UX, *Appellants, v.* NORTHWEST
CATTLE & RESOURCES, INC., *Respondent.*

491 P2d 195

*Wendell Gronso,* Burns, argued the cause for appellants. With him on the brief were Cramer, Gronso & Pinkerton, Burns.

*Theodore R. Conn,* Lakeview, argued the cause for respondent. With him on the brief were Conn & Lynch, Lakeview.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON,[*] Justices.

TONGUE, J.

This is an action for damages for breach of a contract for the sale of some 2,000 head of cattle in Harney County. Defendant counterclaimed for damages, alleging that plaintiffs had breached the same contract. After a trial before a jury, a verdict and

---

[*] Bryson, J., did not participate in this decision.

judgment was entered in favor of defendant, but awarding no damages. Plaintiffs appeal.

The primary problem presented on this appeal involves the interpretation of a printed form contract, which was furnished by plaintiffs' cattle buyer and filled out by him on the wing of an airplane, where it was signed by him and by defendant's manager.

The contract provides for the sale of the cattle at an agreed price per head, totaling over $600,000, depending upon the final count and after "all unmerchantable out." Twenty thousand dollars was paid as a down payment, with "the balance of the purchase price to be paid on delivery of the cattle."

The contract then provided that "delivery to be made by April 1/70 *at the Buyer's option* at Ranch F.O.B. trucks/cars, * * *." However, at the bottom of the form contract, under the printed heading "Remarks," the following was inserted: "After April first —Buyer pays feed bill at $20 ton *if Ranch deal is not completed.*" (Emphasis added)[1]

Plaintiffs assign as error the instruction of the trial court to the jury that, as a matter of law, the contract required both delivery and payment by April 1, 1970. The basis for that contention by plaintiffs is not that the contract was ambiguous and that the intended meaning of its terms should have been submitted to the jury for decision based upon evidence of the circumstances and conversations between the parties at the time of its execution. On the contrary, plaintiffs contend that these terms of the contract should have been interpreted, as a matter of law, to the effect that plaintiffs had a "buyer's option" to

---

[1] The complete form contract, as filled out and signed by the parties, is as follows: (See p 1363).

## N° 628      LIVESTOCK CONTRACT

THIS CONTRACT made this _17_ day of _March_ 197_0_, by and between _North West Cattle & Reserve_ of _Burns Oregon_ hereinafter known as SELLER, and _Ralph Rowley_ of _Elko ---- N----_, hereinafter known as BUYER, covers the sale of the following described livestock for the consideration of the sum of $_20,000.00_ part payment, the receipt of which is hereby acknowledged by the SELLER; balance of purchase price to be paid _on delivery of cattle_ -

| Number Head | Description | Branded | Price | Per |
|---|---|---|---|---|
| 2000 | Cows | 7L LR | $280.00 | Hd |
| 121 | Bulls | '' '' | $400.00 | Hd. |
| 2 | '' | '' '' | $300.00 | Hd. |
| 5% cut on Cows - at | | | $235.00 | Hd. |

These cattle are now located _Burns, Oregon - in NW Ranch_
and are to remain _Same_ until delivered.
Delivery to be made _by April 1/70_ at the _Burns_ option at _Ranch_ F.O.B. trucks/cars, and
to be weighed as follows: _All unmerchantable out_

All cattle are to be weighed dry, with no feed or water, at daybreak the morning of delivery unless otherwise specified Also, all cattle are to be sound and in merchantable condition, and free of any contagious disease. Crippled, deformed, blind-eyed, locoed, lump-jawed, or otherwise deformed animals may be rejected by the buyer.
Health and brand certificates to be furnished by the seller. If the cattle under this contract should become quarantined from hoof and mouth disease this contract would become null and void and all advanced money would be refunded to buyer. All cattle are to be delivered free of all encumberances and with a clear title.

Buyer should be informed at time of purchase of any cattle that have been implanted with, or fed orally, any type of hormones.
Remarks: _After April 1st - Buyer pay full at 30 Ton_ _____ _Plan all cattle not acceptible_ _____
_Ralph Rowley_ (Buyer) _Nothwest Cattle & Reserve_ (Seller)
By _W. M. McMillen_    By _Robert A. White_
Title _____    Title _Vice Pres'd Mgr._

_(Witness)_      _- (Witness)_

FREE PRESS PRINT, ELKO, NEVADA

take delivery either before or after April 1st if the "ranch deal" was not completed by that date and that under the law the buyer was entitled to a "reasonable time" after April 1st to take delivery and make payment.

Defendant agrees with the plaintiff that the contract was not ambiguous and should be interpreted by the court, as a matter of law, but disagrees with plaintiffs' interpretation of the terms and agrees with the trial court that the terms of the contract are clear and unambiguous and must be interpreted, as a matter of law, to require both delivery and payment on or before April 1, 1970.

Both parties, however, offered considerable testimony relating to the circumstances and conversations between their representatives, both before and after the contract was signed. Thus, plaintiffs offered testimony that at the time the contract was signed they planned to resell the cattle to another buyer who had a "deal" then pending for the purchase of a ranch where he intended to take the cattle. Plaintiffs' cattle buyer admitted that defendant's manager told him at that time that defendant wanted the cattle delivered and paid for by April 1st "if it was possible," but testified that nothing was said at that time that the cattle would "have to be paid for by April 1st." He also testified that he told defendant's manager that he could see no reason why the delivery and payment could not be completed by April 1st, but also said that if something went wrong with the "ranch deal" it might take longer to "get the cattle out," but that in such event plaintiffs would pay for feeding the cattle. He also testified that they then agreed on a price of $20 per ton for buying hay from defendant in such an event and that he planned to take the cattle even if that "ranch deal" blew up, but that it might then take longer to move them and that this was the reason for these provisions of the contract.

Plaintiffs' cattle buyer also testified that it was not until the next day that defendant's manager called and wanted the cattle "moved" by April 1st; that he [the buyer] then said that he didn't "think" that there would be any "problem" because he thought the ranch deal was going through and that he thus agreed to come to Burns on March 23rd to "try" to start "moving the cattle." He denied, however, that he ever gave any commitment to start moving the cattle on that date or that he ever gave any specific date for taking

or completing delivery of the cattle, but only agreed to move them out as soon as possible and that he did not know when that might be because the "ranch deal" was not yet confirmed.

Plaintiffs' cattle buyer testified, however, that when he got to Burns on March 23rd the "ranch deal" fell through and that he then immediately started to find other purchasers for the cattle. Although claiming that he had offers to purchase most of the cattle and there was "no problem" in selling them, plaintiffs' buyer did not give defendant any definite date for the commencement of delivery of the cattle. He also admitted that defendant kept insisting that the delivery and payment be completed by April 1st and also arranged for trucks for shipment of the cattle and did everything possible to cooperate to get the cattle delivered. He also testified that he tried his best to take delivery of the cattle by that date and never refused to take delivery of the cattle or said that he "can't take" the cattle, as claimed by defendant.

Defendant's version of these same conversations and transactions is quite different. Thus, defendant's manager testified that because of various financial commitments, as well as for other reasons, before the contract was signed he was "specific" in telling plaintiffs' cattle buyer that the cattle had to be delivered and paid for by April 1st; that plaintiffs' buyer was anxious at that time to start moving the cattle and assured him that all of the cattle would be "out" by that date, and that there was no disagreement on that point.

Defendant's manager also testified that the reason for the added provision relating to feeding the cattle "if ranch deal not completed" was that it was

agreed that if, after plaintiffs "received" the cattle they needed to leave them on the ranch for a "few days," because of bad weather or trouble in getting trucks defendant would furnish hay to plaintiffs to feed the cattle at the price of $20 per ton.

In addition, defendant's manager testified that on that same date they discussed March 23rd as the date for the commencement of delivering the cattle; that the next day he called plaintiffs' buyer to "clarify" the April 1st delivery date and was told that this was "no problem." He also testified that three days' later he also called to reaffirm March 23rd as the date to start delivery, since it was necessary to make arrangements with the brand inspector and other arrangements to start delivery of the cattle and was told by plaintiffs' buyer that he was having "a little trouble," but would let defendant know. On calling plaintiffs' cattle buyer again he was told that the buyer was coming to Burns to try to move the cattle.

Defendant's manager testified that on March 27th, after plaintiffs had failed to start taking delivery on March 23rd, he went to Burns where he met with plaintiffs' cattle buyer to get a delivery date, but was told by him "I don't have 'em sold" and "I can't take 'em."

From that date until April 4th, according to defendant's manager, he contacted plaintiffs' cattle buyer "daily" and told him defendant had to have payment by April 1st and offered to make delivery on the ranch based on a count of the cattle, so that plaintiffs could then feed them and ship them out at its convenience, but plaintiffs refused to do so and never gave him a date for starting to take delivery.

On April 4th defendant delivered a written de-

mand to plaintiffs that it take delivery of the cattle the next day and make payment in full upon completion of delivery. Upon being told that this would be impossible, defendant then, on April 5th, delivered a further written demand that plaintiffs' representative meet the next day at a bank to make arrangements for deposit in escrow of the purchase price in full, "payable each day as cattle deliveries are made," starting that same day and continuing at the rate of 500 per day.

Plaintiffs declined to attend such a meeting, and offered testimony that delivery at that rate would have been impossible, but on April 6th offered in writing to take delivery on April 16, 1970, and demanded that the cattle be delivered on that date. That demand, in turn, was rejected by defendant on April 8th, taking the position that the contract required delivery and payment by April 1st; that defendant had been ready, willing and able to deliver the cattle both prior to April 1st and also as late as April 8th, but was not willing to extend the date for delivery and payment until April 16th. Thus, it was admitted that the contract was then terminated by defendant.

Meanwhile, on April 1st plaintiffs had started to feed the cattle and continued to do so until after April 6th. Defendant's manager testified that defendant then took over feeding the cattle, at a cost of $4,320, and that because of high water and feed conditions it also had to truck the cattle to another ranch, at a cost of $10,454.11. Plaintiffs' manager also testified that during this same period there was a drop in the cattle market of $30 per head (or over $60,000 for 2,000 head) for cattle of that quality.

At the conclusion of the testimony plaintiffs

moved for a directed verdict upon the ground that the termination of the contract by defendant was not "reasonable" as a matter of law, citing ORS 72.3110. That motion was denied by the trial court on the ground that the interpretation of the contract was a question of law for the court if the contract was not ambiguous and that this contract was not ambiguous, but required delivery by April 1st.

The trial judge then submitted the case to the jury with an instruction (similar to that requested by defendant), that "as a matter of law in this case the contract between the parties did require payment of the cattle upon delivery, and it did further require * * * that delivery of the cattle be made by the 1st of April of 1970."

Before returning its verdict for defendant the jury requested further instructions on the definition of the words "buyer's option."[2] In the course of discussions with counsel, plaintiffs took the position that this "option" extended for any reasonable time after March 17th (the date of the contract) and was not limited to April 1st. The court, however, ruled and instructed that this contract provision "means that the buyer had the option of taking delivery of those animals defined in the contract at any time between the 17th day of March of 1970, up until the first day of April of 1970, as called for in the contract."

From the proceedings on the trial of this case, as well as on this appeal, it appears that both parties have taken the position that this contract is clear and unambiguous and that the question of its interpreta-

---

[2] The contract provided "delivery to be made by April 1/70 *at the Buyer's option* at Ranch F.O.B. truck/cars * * *." (Emphasis added)

tion is a question of law for the court. Thus, plaintiffs have contended that, as a matter of law, the terms of the contract gave them an "option" to take the cattle at any reasonable time after March 17th, while defendant has contended (and the trial judge instructed) that, as a matter of law, its terms required both delivery and payment by April 1st. Neither party contended that the terms of the contract were ambiguous and that the intended meaning in the use of such terms was a question of fact which should have been submitted to the jury.

■ The respective functions of the court and jury in cases involving the interpretation of contracts were discussed by this court in a recent opinion by McALLISTER, J., in *May v. Chicago Insurance Co.,* 260 Or 285, 490 P2d 150 (1971). In that case the court recognized that, as a general rule, the construction of a contract is a question of law to be decided by the court; that, accordingly, if the provisions of a contract are clear and unambiguous it is the function of the court to interpret the contract and declare its legal effect, but that if provisions of a contract are ambiguous, the intent of the parties in the use of such terms is a question of fact for the jury, citing *Libby Creek Logging, Inc. v. Johnson,* 225 Or 336, 339, 358 P2d 491 (1960).

This court in *May* also quoted with approval from 4 Williston on Contracts 660, § 616 (W. Jaeger 3d ed 1961), as follows:

"The jury's function in the interpretation of documents then will arise wherever, in view of the surrounding circumstances and usages offered in evidence, the meaning of the writing is not so clear as to preclude doubt by a reasonable man of its meaning."

The court also went on to quote with approval from 65 ALR 648, as follows:

"When, however, extrinsic evidence of surrounding circumstances or other facts bearing upon intention have been introduced, a question of fact may arise which must be submitted to the jury. Theoretically, this does not necessitate the invasion of the court's province in construing written contracts, but merely requires a construction by the court in the light of the facts found by the jury from the extrinsic evidence. This function the court may still perform by instructing the jury to return a finding upon the question of fact arising from the extrinsic evidence submitted to them, and itself determining the construction in the light of the fact so found. Or it may submit the matter of interpretation to the jury under binding instructions as to what construction should be put upon various hypothetical states of fact which they may find. * * *."

■ In this case, after considering not only the terms of this contract, but also the evidence of the circumstances and conversations between the parties at the time of its execution, we are of the opinion that the provisions of this contract were not "clear and unambiguous," as contended by both parties (to support contrary contentions) and as held by the trial judge, but that "the meaning of the writing is not so clear as to preclude doubt by a reasonable man of its meaning."

■ It follows that it was error for the trial judge in this case to undertake to instruct the jury on the intended meaning of these contract provisions, as a matter of law. It does not follow, however, that the judgment of the trial court must be reversed and the case remanded in order that this question may be submitted to the jury, as a question of fact.

If at the time of trial plaintiffs had requested

an instruction submitting the question of the intended meaning of the contract terms relating to the time for delivery and payment to the jury as a question of fact, or if they had excepted to the instruction of the trial court on that ground, it would have been reversible error for the trial judge to have refused such a requested instruction or to have denied such an exception. However, no such requested instruction or exception was made or taken by the plaintiffs in this case.

■ Where, as in this case, a party prevails upon the trial judge to decide as a matter of law a question which should have been submitted to the jury as a question of fact, it is held that such a party has "invited" the resulting error and is "estopped" to complain of such an error, even though the error would otherwise have been a prejudicial error requiring reversal. *Pacific Indemnity Co. v. McDonald,* 107 F2d 446, 449 (9th Cir 1939); *Coorough v. DeLay,* 171 Cal App 2d 41, 339 P2d 963, 967 (1959). Cf. *Richardson v. Portland T Car Co.,* 113 Or 544, 551, 223 P 540 (1925). At least, such a result should follow unless the party can demonstrate that the result of the case would otherwise have been different.

As previously stated, we do not agree with plaintiffs' contention that the language of this contract is "plain and unambiguous and can have but one meaning." Neither do we agree with plaintiffs' contention that, as a matter of law, the "one meaning" of these provisions of this contract was to confer upon plaintiffs an "option" to delay delivery and payment until after April 1, 1970, and for a "reasonable period of time, in the event that the 'ranch deal' is not completed."

■ It may be that a jury, after considering all of the testimony relating to the conversations between the parties and the other surrounding circumstances, could have reasonably found that such was the intended meaning of those provisions of this contract. On the other hand, we believe that the jury could also have reasonably found, after considering all of such evidence, that by the use of these contract terms the parties intended that the cattle be delivered and paid for by April 1, 1970, regardless of provisions for possible feeding of cattle after that date. Such a finding would have been supported by ample evidence and would have reached the same result as reached by the trial judge in his interpretation of the contract.

Therefore, since we cannot say that the jury would have reached a different result than was reached by the trial judge and since plaintiffs did not at any time request that this question be submitted to the jury, but instead joined with the defendant in requesting the trial court to decide that question as a matter of law, it follows that the judgment in favor of the defendant in this case should not be reversed in the absence of some other error.

■ Plaintiffs also assign as error the refusal of the court to direct a verdict for plaintiffs upon the ground that termination of the contract was "unconscionable," as a matter of law, and the further refusal to give a requested instruction that defendant's termination of the contract was not "within the limits of commercial reasonableness," also as a matter of law.

For reasons previously stated, the provisions of the contract relating to the time for delivery and payment were ambiguous and the question of the intended

meaning of those terms, in the light of the evidence of the conversations between the parties and other surrounding circumstances, was a question of fact which should have been submitted to the jury. Since the right of the defendant to terminate the contract depended upon the answer to that question, it follows that plaintiffs were not entitled either to a directed verdict or to an instruction that defendant's termination of the contract was improper as a matter of law.

Plaintiffs' final assignment of error is that the court improperly overruled objections to the admission in evidence of photostatic copies of 47 freight bills for moving the cattle (including calves) to another location, with an attached "summation" listing the amounts shown by each of such freight bills, together with a computation of the total number of cattle hauled and the total freight charges.

The stated objections to this exhibit were that the original freight bills were in the possession of defendant; that there was no foundation that they were "kept in the usual business" of defendant and that the "summation" was made by "somebody" and at some unknown time.

These freight bills were identified by defendant's general manager, who was in charge of the shipment of the cattle and who testified that he examined and inspected them as they were received from the freight lines which hauled the cattle; that he then found some errors, which were then corrected, and that these freight bills were correct based upon that examination and inspection by him. He also testified that the "summation" was prepared by defendant's president; that these freight bills, together with the "summation" were "made in the usual course of business by the

corporation." It also appeared that defendant's counsel had furnished plaintiffs' counsel with that "figure prior to this lawsuit" and that the trial judge also provided plaintiffs' counsel ample opportunity to check the correctness of the "summation," which was a matter of simple arithmetic, based on figures from the attached freight bills.

■■ The photostatic copies of the freight bills were not inadmissible upon the ground that they were not the "best evidence" because the objection to such evidence, as relied upon by plaintiffs on this appeal, was not made on that ground and no contention is made that the photostatic copies of the freight bills were not correct and accurate copies of the original freight bills. See also ORS 41.720 and McCormick on Evidence 420-421, § 206 (1954). Instead, the primary thrust of plaintiffs' objection is that information shown on the freight bills was not proved to have been correct and that the "summation" was also not proved to have been correctly prepared.

In addition, no express objection was made upon the ground that such documents were inadmissible as constituting hearsay evidence or as not properly identified or authenticated. However, these are the implicit grounds of plaintiffs' primary objections to this evidence.

■■ We hold, to the contrary, that neither the freight bills nor the attached "summation" was subject to proper objection as constituting hearsay evidence or for lack of proper authentication but that these documents were admissible as business records based upon the testimony of defendant's manager that he had personal knowledge of the facts relating to the shipments of cattle represented by the freight bills and had

checked them personally and also because of his further testimony that both the freight bills and "summation" were kept and prepared in the regular course of business. ORS 41.690. In addition, as previously noted, the correctness of the "summation" was subject to simple verification by reference to the attached freight bills, with the result that any error in its admission was not prejudicial.

For all of these reasons, the judgment of the trial court is affirmed.