**ZIDELL, INC., an Oregon corporation, Plaintiff,**

v.

**PACIFIC NORTHERN MARINE CORPORATION, a Washington corporation, and Crowley Maritime Corporation, a Delaware corporation, Defendants.**

**Civ. No. 88–1263–MA.**

United States District Court,
D. Oregon.

Jan. 12, 1990.

**984**

Dean D. DeChaine, M. Christie Helmer, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for plaintiff.

Lloyd Weisensee, Williams, Fredrickson, Stark & Weisensee, P.C., Portland, Or., Dennis J. Kelly, Amy E. Sherburne, Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for defendants.

## OPINION

MARSH, Judge.

This is a maritime claim under Fed.R. Civ.P. 9(h) in which plaintiff seeks to recover damages arising out of a Charter Party dispute. Plaintiff contends that defendants failed to return a barge in the condition required by the terms of the Charter Party lease agreement. Defendants contend that the barge satisfied the charter requirements. Defendant Pacific Northern Marine Corporation ("Pacific") also counterclaims for overpayments, interest, survey costs and moorage fees. A bench trial was held November 20–22, 1989. Thereafter counsel submitted written argument and the matter was taken under advisement on December 8, 1989. The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FINDINGS OF FACT

Plaintiff Zidell, Inc. ("Zidell") is a corporation duly organized and existing under the laws of the State of Oregon with its principal place of business in Portland, Oregon.

Defendant Pacific Northern Marine Corporation is a corporation duly organized and existing under the laws of the state of Washington with its principal place of business in Seattle, Washington. Defendant Crowley Maritime Corporation ("Crowley") is a Delaware corporation with its principal place of business in San Francisco, California.

On December 21, 1979, Zidell and Pacific entered into a seven year bareboat Charter Party ("Charter Party") wherein Pacific agreed to bareboat charter a new grade D petroleum barge from Zidell. On June 27, 1980, the barge ROSEMARIE was delivered to Pacific.

On March 1, 1985, defendant Crowley unconditionally guaranteed the complete performance of Pacific.

By letter agreement dated June 27, 1987, Zidell and Pacific entered into a one year renewal term with an option to extend the term for an additional two years. The charter hire rate agreed upon for the renewal term was $22,000 per month. The parties also agreed that the other terms and conditions of the original Charter Party would remain in full force and effect throughout the renewal term.

Paragraph 8.1 of the Charter Party provides that Pacific shall exercise reasonable diligence to maintain the ROSEMARIE in "as good order and condition as it is upon delivery by Owner to Charterer ... excepting ordinary wear and tear."

In addition, the Charter Party contains a liquidated damages provision. Paragraph 3.2 provides that the charterer will be liable for holdover at the rate of $1100 per day for the first twenty-nine days following the expiration of the charter term, and $2200 per day thereafter. Interest on late pay-

ments under the Charter Party is governed by paragraph 3.3.

Section five of the Charter Party describes the inspection process upon redelivery of the vessel. Paragraph 5.2 requires the United States Salvage Association, Inc. (Salvage Association) to perform an "off-hire" survey "at or as soon as practicable after" redelivery of the vessel. Paragraph 5.3 provides that the cost of this survey shall be "borne equally by the parties."

Section fourteen of the Charter Party provides that the interpretation of the agreement and the rights and obligations of the parties "in equity, admiralty or at law, shall be governed by the substantive law of the State of Oregon insofar as applicable." Paragraph 14.3 provides that the prevailing party in any suit or action be entitled to reasonable attorney fees and charges incurred in litigation.

The total payment made towards the charter hire on the initial seven-year charter was $1,919,042.16.[1] The parties agree that, as of June 26, 1987, Pacific had overpaid charter hire in the amount of $44,691.48.

In May, 1988, Pacific drydocked the ROSEMARIE as part of its regular maintenance program. The barge was inspected by the United States Coast Guard and a renewal certificate of inspection was issued on May 31, 1988.

During June of 1988, the parties discussed the possibility of extending the charter for an additional two years. However, this second extension was not consummated and in late June, 1988, Pacific indicated its intent to return the barge to Zidell.

On June 28, 1988, the ROSEMARIE was moved to Pacific's dock for inspection. Pacific inspected and repaired all machinery at this time.

On July 6, 1988, Pacific delivered the ROSEMARIE to the Ak–Wa Shipyard in Tacoma, Washington. On this same day, a representative from the Salvage Association along with Greg Dronkert, port engineer for Zidell, William Kelley, manager of

engineering for the Pacific Division of Crowley, and Bill Metcalf, port engineer for Crowley Marine, conducted an exterior inspection of the barge. Thereafter an off-hire survey was prepared which recommended a number of repairs to the barge's exterior structure. Defendants paid $11,639 for the off-hire survey, shift towing and drydocking during the survey. Plaintiff concedes that it is obligated to share the costs of the off-hire survey totalling $872 and drydocking totalling $8,682, but disclaims liability for the costs of shift towing.

On July 7, 1988, Mr. William Gobel, vice-president of Zidell, and Mr. Kelley, met at the Ak–Wa Shipyard to conduct an inspection of the ROSEMARIE. At this meeting, Mr. Gobel indicated that he did not consider the barge "redelivered" pursuant to the terms of the Charter Party because the barge was not in "good condition." Mr. Kelley indicated that he was tendering the barge for redelivery on behalf of Crowley.

Thereafter, the parties entered into a series of negotiations regarding a cash settlement for repairs to the barge structure and cleaning necessary to effect the repairs. After receiving the found and recommended surveys from the Salvage Association, both parties obtained and exchanged bids for repairs. However, they were unable to reach agreement on a cash settlement.

Once the negotiations failed, defendants contracted and paid the expenses for the repair of the vessel. On September 23, 1988, Pacific took the ROSEMARIE to the Duwamish Shipyard for repairs. Pacific also hired Coastal Cleaning to clean portions of the interior of the tanks to make the area safe for "hot work" necessary to perform repairs. These repairs took place September 24, 1988, through October 12, 1988, at which time the ROSEMARIE was returned to the plaintiff. There is no dispute regarding the quality of the structural repairs. Further, plaintiff does not now contend that it is entitled to hire/loss of use damages past October, 1988.

1. This includes the initial payment of $42,000 plus 84 payments of $22,345.74.

During January and February of 1989, Zidell cleaned the interior of the tanks and enlarged the limber holes to further facilitate the barge's pumping capability.

## DISCUSSION

### a. *Structural Damage*

 The dispute in this action centers around the following language contained in paragraph 8.1 of the Charter Party agreement:

> During the whole of the Charter Term and any extension thereof, the Charterer shall, at its sole expense and account, exercise reasonable diligence under all circumstances to maintain the Vessel in as good order and condition as it is upon delivery by Owner to Charterer under this Agreement and shall, upon redelivery thereof at the conclusion of the Charter Term and any extension thereof, redeliver the same in such condition to Owner excepting ordinary wear and tear
> . . .

The off-hire survey together with the follow-up found and recommended survey performed in July of 1988 indicated areas of structural damage that exceeded ordinary wear and tear. The parties disagree on how the necessity of repairs affects their respective rights and liabilities under the Charter Party. Plaintiff contends that it is not required to accept the vessel until the necessary repairs have been made. Defendants contend that the parties, by the terms of the Charter Party, anticipated a period of possible repairs and that a period of reasonable overlap was considered for which no additional charter hire may be claimed. Defendants also contend that the normal industry practice anticipated that the charterer would negotiate with the owner regarding the costs of repairs and compensate the owner with a cash settlement in lieu of repairs. According to de-

fendants' version, the owner is then left with the choice of whether or not to carry out the repairs at its discretion.

A great deal of testimony was received regarding the negotiations over a cash settlement that occurred between July 7, 1988, and the early part of September, 1988. Both parties raise charges of bad faith negotiation, stalling and misrepresentation.

Based upon the testimony and exhibits received into evidence, it is clear to me that neither party anticipated that the charter agreement would be terminated without further extension. When the parties were unable to come to an agreement for an extension of the charter term, ill-will developed which led to a disagreement over the condition of the barge and the extent of defendants' responsibility. In considering both parties' claims of bad faith and stalling I find that both Crowley and Zidell were unrelenting in their negotiations. Thus, the difficult question that I must decide when considering plaintiff's claim for hire/loss of use during this period is which party should bear the burden of a settlement gone awry.

The Charter Party provides that the ROSEMARIE shall be returned in "good order and condition . . . excepting ordinary wear and tear." A term or phrase in a contract is ambiguous if it has "no definite meaning or if it is capable of more than one sensible interpretation." *Hayden Corporation v. Gayton*, 98 Or.App. 703, 706, 780 P.2d 787 (1989).[2] Because the foregoing phrase is capable of more than one reasonable interpretation, I conclude that it is ambiguous. Thus, I must look to the surrounding circumstances and the intent of the parties to discern the meaning behind the terms. *See Rolfe v. N.W. Cattle & Resources, Inc.*, 260 Or. 590, 600–601, 491 P.2d 195 (1971).

---

**2.** During the course of trial I asked the parties to address the issue of the law applicable to this case because the charter party provided that Oregon law would apply and neither side had uncovered any controlling authority under federal maritime law. At the close of evidence the parties agreed that there was no distinctive controlling federal maritime law on point, although there were some "persuasive" authorities from other jurisdictions. The parties indicated that Oregon law may be applied to supplement federal maritime law as Oregon law is consistent with the Restatement of Contracts utilized in federal admiralty claims. *See Wheeler v. Bonnin*, 47 Or.App. 645, 649, 615 P.2d 355 (1980).

The bulk of the evidence on the intent of the parties regarding the redelivery condition involved the negotiations surrounding the 1987 extension letter. Different forms of charter party agreements were also introduced and discussed to shed light on the intent, but the evidence of original intent was nonexistent. The letter agreement of June 27, 1987, merely extended the term of the charter and set a new rate. The remaining charter terms, including paragraph 8.1, were incorporated by reference. Therefore, in the absence of any significant testimony regarding the parties' intent at the time the original charter agreement was formed, I look to the surrounding circumstances, including industry custom, to determine what the parties originally intended regarding the structural condition of the barge upon redelivery.

The fact that the parties expended some further energy in determining the cost of repairs in an attempt to reach a settlement figure, does not establish the intent as claimed by Crowley. Based upon the terms of the Charter Party, particularly paragraph 8.1 and section 12 [3], I conclude that the owner was not required to accept a cash settlement, but rather was entitled to have the vessel returned in good condition, ordinary wear and tear excepted, upon the expiration of the charter term. Accordingly, as discussed more fully below, I conclude that plaintiff is entitled to recover for the holdover period necessary to bring the ROSEMARIE into "good condition."

### 1. Hire/Loss of Use from 6/26/88–7/7/88

■ Defendants concede that they are liable for hire/loss of use damages during this period. Defendants argue, however, that this court should find the liquidated damages provision found at paragraph 3.2 of the contract void as a penalty, and thus should award the fair market value of the rental. Defendants contend that fair market value for the relevant period is either $733/day (1/30th of the monthly rental of $22,000 agreed to under the terms of the

extension), or $833/day as testified to by Robert Beegle, President of Marcon International, Inc.

■ A liquidated damages provision is enforceable if the amount fixed is a "reasonable forecast of just compensation" and the harm caused by breach is "incapable or difficult of accurate estimation." *Illingworth v. Bushong*, 297 Or. 675, 680, 688 P.2d 379 (1984). The party seeking to avoid the clause bears the burden of proof on both elements. *Id.* Defendant may satisfy this burden by showing that the liquidated damages are "grossly disproportionate" to actual damages. *Id.*

Although neither party introduced evidence of the parties' intent or manner of selection of the stated amount at the time the contract was formed, I find that several factors indicate that the $1100 figure was a reasonable forecast of actual damages. First, the Charter Party was not a form document, but rather a contract drawn specifically for these parties. Second, both parties are highly experienced members of the shipping industry. Third, $1100 per day is not "grossly disproportionate" to the fair market rate of $833 for the period at the end of the lease. Finally, given the long-term nature of the agreement (eight years), any harm caused by the breach would have been difficult to estimate with any accuracy.

Therefore, I find that defendants have failed to demonstrate that the liquidated damages clause of the Charter Party should be void as a penalty insofar as it relates to the $1100 rate. Accordingly, plaintiff is entitled to eleven days of charter hire/loss of use at the rate of $1100 per day, or $12,100.

### 2. 7/8/88—10/12/88

Mr. Kelley testified that Crowley prepared the "found and recommended" surveys from July 8, 1988, to August 3, 1988. Such surveys are a necessary prerequisite to obtaining bids for repair work. Kelley

---

**3.** Section 12 of the Charter Party provides: "The Charterer covenants and agrees on demand to pay Owner all costs and expenses incurred in returning the Vessel to the same condition as it was on delivery, ordinary wear and tear excepted."

indicated that he felt there was no need to hasten their preparation since the parties were in the course of negotiating a cash settlement.

From August 3, 1988 to August 18, 1988, Crowley sent out the surveys, received bids, and sent the bids to Zidell. From August 19th to September 6, 1988, Zidell obtained five bids of its own. From September 7th to September 23rd the parties attempted to negotiate a settlement for the costs of repairs. On September 23, 1988, negotiations broke down and from September 24, 1988 through October 12, 1988, Crowley had the repairs made at its own expense.

■ Defendant argues that plaintiff should not be entitled to any damages following July 7, 1988, in the absence of evidence of actual damages. Bill Gobel testified that Zidell suffered no actual damages during the period between July 7, 1988 and October 12, 1988.

In *Illingworth* the Court noted that absence of actual damages is a relevant factor to determine whether the effort to forecast expected damages was "bona fide." *Illingworth*, 297 Or. at 685, 688 P.2d 379. However, this does not preclude plaintiff from recovering for hire/loss of use for the time it took to effectuate the repairs that Crowley acknowledges it was required to perform. Paragraph 3.2 of the Charter Party provides that the owner shall be compensated for each day of holdover at a daily rate of $1100 for the first twenty-nine days of holdover. Thus, I find that the parties mutually agreed that the Charterer would compensate the Owner for holdover at a daily rate, irrespective of actual damages. Since I find that $1100 is a reasonable forecast of actual damages, plaintiff is entitled to recover $1100 per day for the first twenty nine days of holdover.

■ Because plaintiff wisely does not seek to enforce the $2200 provision and because the $1100 provision only applies to twenty-nine days, I find that any period

beyond the initial twenty nine days should be compensated at a fair market rate for the balance of the relevant time-frame. At trial, Bill Gobel testified that the fair market rate for daily charter hire of the ROSE-MARIE would have been between $833 and $1100. Robert Beegle testified that the market rate during this period was $833 per day. The contractual rate during the term of the charter was $733 per day. I conclude that $833 represents a fair daily rate for a Grade D petroleum barge during the relevant time-frame.[4]

I now turn to the issue of the actual time necessary to effect exterior repairs to the ROSEMARIE.

■ Throughout July and August the parties spent twenty-seven days to prepare and obtain "found and recommended" surveys necessary to get the bidding process started. Because there is evidence that both parties failed to expedite the preparation of these surveys, I find that plaintiff is entitled to recover hire/loss of use damages for only seven of those twenty-seven days.

■ In August and September defendants spent fifteen days sending out the surveys and receiving bids on the repair work. Defendants then submitted those bids to plaintiff who thereafter sought additional bids. I find that plaintiff is entitled to recover hire/loss of use for the fifteen days it took defendants to complete their bidding process for the repairs.

■ Finally, I find that plaintiff is entitled to recover hire/loss of use for the nineteen days it took to actually perform the repairs between September 24th and October 12th. Accordingly, I find that plaintiff is entitled to forty-one days of hire/loss of use damages for the period between July 8, 1988 and October 12, 1988. The first eighteen days shall be compensated at a daily rate of $1100 per day, or $19,800, pursuant to paragraph 3.2 of the

---

4. I find that limiting plaintiff's recovery to fair market value following the twenty-nine day provision of paragraph 3.2 is consistent with the

parties' intent to compensate for holdover at an equitable rate.

Charter Party.[5] The remaining twenty three days shall be compensated at the fair market rate of $833 per day, or $19,159. Accordingly, plaintiff is awarded $38,959 for hire/loss of use during this period.

By limiting plaintiff's recovery to the actual period necessary to effect repairs, I find that the foregoing conclusion adequately balances the burden of failed negotiations. Therefore, the remainder of plaintiff's request for hire/loss of use during this period is denied.

### 3. 10/12/88—10/26/88

Plaintiff's request for hire/loss of use during this period is based on its contention that the tanks were not open when returned, and thus could not be inspected for the purposes of obtaining a cleaning bid until October 26, 1988. As discussed more fully, *infra*, I find that plaintiff is not entitled to recover for cleaning and costs incident thereto. Thus, this request is denied.

### b. *Cleaning Expenses*

██ Plaintiff contends that when the barge was returned on October 12, 1988, it was inoperable, and therefore not in "good condition," due to the presence of an excessive amount of retain and residue ("sludge") present in the tanks. This condition was not discovered at the time of the external inspection conducted by the parties on July 6, 1988. When the repairs were carried out in September and October, 1988, the performance of hot work required that sludge be removed from the areas

adjacent to the repairs. This cleaning was accomplished by moving the sludge into piles outside the area of repairs.

Throughout the course of the trial a great deal of testimony and evidence was introduced regarding "cat fines," "residue," and "retain" and "scales" found in the tanks of the ROSEMARIE.[6] In addition, both parties submitted expert and lay testimony regarding normal amounts of buildup that one would expect to find in a grade D tanker used to haul "dirty" petroleum products.[7]

Plaintiff contends that the charterer was responsible for removing the piles, together with other residue and retain in the bottom of the tanks, in order to make the barge operable. Plaintiff seeks $29,768 for costs it incurred in cleaning the tanks in January, 1989, as well as hire/loss of use during cleaning of $30,800 for twenty-eight days.[8]

Defendants contend that the mode of repairs and the presence of retain and piles of sludge were normal and did not affect the operability of the barge. Thus, defendants argue, any sludge found in the bottom of the ROSEMARIE should be considered "ordinary wear and tear" for a Grade D petroleum barge. In addition, defendants dispute that the barge was ever nonoperational.

Greg Dronkert and Shell Phillips, port engineer for Washington Marine,[9] took photos of the barge's interior in October of 1988 which were introduced into evidence. They testified that the barge would be in-

---

5. Out of a total of twenty-nine days provided for in paragraph 3.2, the first eleven days of holdover has already been compensated as described in subsection "1" of my opinion. Accordingly, eighteen days remain under the $1100 provision.

6. The terms "cat" or "catalytic fines," "residue" and "sludge" refer to the heavier byproducts of cargo that settle out and accumulate of the barge floor to form a putty-like substance. The term "retain" refers to the liquid form of what remains after the cargo is pumped out of the tanks. "Scales" refers to the dirt and steel that deteriorates off the inside of the barge. Testimony from both sides indicated that a certain amount of both residue and retain would be expected from normal cargo hauling activities.

7. The term "dirty" petroleum products refers to the heavier black oil type cargoes. In contrast, "clean" petroleum products refers to the lighter cargoes such as gasoline.

8. As previously discussed, plaintiff does not seek to enforce the latter provision of the liquidated damages clause in the charter party which calls for a rate of $2200 per day following twenty-nine days. Plaintiff does, however, seek to enforce the $1100 daily holdover rate with respect to all claims for hire/loss of use following expiration of the renewal term.

9. Washington Marine is an affiliate of Zidell, Inc.

operable because there were piles of residue in several barge tanks which dammed the limber holes used to facilitate the pumping of cargo. They also testified that the pumps were not tested prior to being cleaned in January and February of 1989.

Both parties introduced testimony regarding industry practice relating to the cleaning required to effectively operate a Grade D petroleum barge. Jerry Purschell, port engineer for Phoenix Marine, and Ruben Garcia, operations manager for A.M. Pumping testified that it is necessary to thoroughly clean the interior barge tanks prior to a Coast Guard inspection for the purpose of maintaining Coast Guard certification. They testified that the barges must, with a hot water wash, be clean enough for "hot work" such as welding.[10]

Mr. Kelley and Captain John deCarteret, a qualified marine inspector for the U.S. Coast Guard, testified that the only cleaning required for internal inspections was an airing out of the tanks to exhaust any fumes. Captain deCarteret testified that if any additional cleaning was necessary he would simply ask one of the workers present to shove some of the residue out of the way.

Tory Larson, vice-president and general manager of Northwest Enviroservice, was responsible for the cleaning of the ROSEMARIE in January and February, 1989. He indicated that his understanding was that the cleaning bids he submitted were for the purpose of preparing the barge for hot work necessary to accomplish the expansion of the limber holes.

Both Mr. Dronkert and Mr. Gobel indicated that they expected the barge to be clean upon redelivery. Mr. Kelley and Steve Wilson, Director of Contracts for Crowley, indicated that Crowley's obligation was at an end if the barge was returned operational and fully certified by the U.S. Coast Guard.

I find that plaintiff's claim for the costs of cleaning and hire/loss of use during

cleaning is dependent upon construction of paragraph 8.1 of the Charter Party. Although both parties cite cases and arbitration decisions from other jurisdictions which indicate that cleaning either was, or was not required in the given circumstances, I find that this authority merely demonstrates that there is a difference of opinion regarding the extent of cleaning necessary to comport with industry custom. Thus, in determining whether cleaning was required under the terms of the Charter Party in this case, I am again left with the terms of the Charter Party itself, any evidence of the parties' intent upon entering into the agreement, and custom and usage in the industry.

Based upon the testimony adduced at trial I conclude that it was normal for a Grade D petroleum barge tank to contain a certain degree of residue and retain. Based upon the photographs of the tanks' interiors, comments contained in the several surveys and the testimony of the parties, I find that the residue and retain levels in the ROSEMARIE were consistent with levels found in other barges currently operating in the Grade D petroleum industry. Particularly, there is no evidence to support plaintiff's contention that the barge was inoperable due to residue build-up blocking the limber holes. Greg Dronkert and Shell Phillips both admitted that the barge pumps were never tested for operability prior to the cleaning that occurred in January and February of 1989. Further, the barge was fully certified by the U.S. Coast Guard as fit for operations in May of 1988.

In addition, I find that the evidence indicates that the cleaning that was performed by plaintiff was done for the purpose of enlarging the limber holes rather than returning the barge to an operable condition. Tory Larson indicated that his cleaning bid was made with the understanding that his company would clear out the areas around the limber holes sufficient to perform the hot work necessary to make the improve-

---

**10.** The testimony of Mr. Garcia and Mr. Purschell was submitted in the form of perpetuation depositions. It is unclear whether their testimony regarding cleaning practices in the petroleum barge industry was limited to Grade D petroleum barges.

ments. Shell Phillips indicated that the cleaning efforts were limited to the bottom twelve inches of the tank only, which leads me to believe that the scope of the cleaning performed by plaintiff was limited to the areas necessary to perform the work on the limber holes. As plaintiff does not contend that defendants are liable for the costs of this improvement to the limber holes, it should not recover for costs incurred incident to these improvements.

Based on the foregoing, I conclude that plaintiff is not entitled to recover for the costs of cleaning the tanks or hire/loss of use for the period it took to clean the barge.

### c. *Pacific Northern's Counterclaim*

Based upon the stipulation of the parties, defendant Pacific is entitled to recover credits in the amount of $44,691.48 in overpaid charter hire, $436 for fifty percent of the Salvage Association survey, and $4341 for fifty percent of the drydocking costs related to the off-hire survey.

Pacific also seeks to recover $1,012.50 in shift towing charges incurred on July 27, 1988 and mooring charges of $1,462.40 for the period between July and late September, 1988. As discussed previously, I find that both parties should bear the burden of failed settlement negotiations. Thus, I find that Pacific is entitled to one-half of their expenses, or $1,227.45, for moorage and towing expenses.

### d. *Interest*

Both parties seek prejudgment interest on any award recovered pursuant to paragraph 3.3 of the Charter Party. Paragraph 3.3 contains two separate provisions for an interest penalty on late payments. The first portion of paragraph 3.3 applies to "all sums due under this Agreement by way of Charter Hire." The latter portions applies to "all sums due or to become due under this Agreement other than by way of

Charter Hire." Both portions fix the interest rate as follows:

> All sums due or to become due under this Agreement ... if unpaid when due, shall bear interest at an annual rate two and one-half percentage points over the "prime rate" offered by the First National Bank of Oregon, at Portland, Oregon, at the date said sums are due or at the highest rate of interest permitted to be charged to, and recoverable from, Charterer under the laws of the State of Oregon.

 Plaintiff contends that it is entitled to prejudgment interest pursuant to the first provision of paragraph 3.3 as any holdover award is part of "charter hire." I agree. Paragraph 3.2, which provides for the daily holdover rate of $1100 during any period of extension, refers to such payments expressly as "charter hire." Paragraph 3.2 further provides that any amounts payable for holdover become "due" within ten days "after the expiration of such extended term."

The Charter Party expired on June 26, 1988. Based upon my findings and conclusions outlined above, the extended term of holdover lasted fifty-two days.[11] Therefore, the expiration of the extended term occurred on August 17, 1988. Pursuant to paragraph 3.2, the amounts payable for such holdover charter hire became due ten days thereafter on August 27, 1988. Accordingly, plaintiff is entitled to prejudgment interest on hire/loss of use damages from August 27, 1988.

 Defendant Pacific contends that it is entitled to prejudgment interest as follows: on its first payment of $22,345.74 from the date it was paid in July of 1980; on its 84th payment of $22,345.74 from the date it was paid in June of 1987; on one-half of their payment of survey, drydocking and moorage expenses of $5,819.50 from May 13, 1989.[12]

---

**11.** This figure represents the eleven days for the initial period of holdover not contested by defendants, as well as the forty-one days of holdover plaintiff is entitled to for the time it took defendants to affect the repairs.

**12.** On April 13, 1989, Pacific demanded payment from Zidell for 50% of its share of off-hire costs. Thus, defendants' claim they are entitled to interest thirty days following demand.

I find no evidence that the parties intended that this provision would apply to counterclaims of the charterer. Given the lack of evidence to guide me in determining the parties' intent upon entering into this agreement in 1979, I am again left with the difficult task of determining what the parties might have considered at the time. However, unlike the provision relating to the barge's condition on redelivery, I find that the interest provision for unpaid sums unambiguously applies only to those sums recoverable by Zidell from charterer.

Further, pursuant to paragraph 3.3, interest on *any* claims would not begin to accrue until written notice of the amounts due is sent. Thus, in the absence of any evidence that defendant Pacific delivered written notice of its overpayments to plaintiff in July of 1980 or June of 1987, Pacific Northern's interest claims for those time periods are denied.

e. *Attorneys' Fees*

Paragraph 14.3 provides that the prevailing party in any suit relating to the Charter Party shall be entitled to recover reasonable attorneys' fees and costs. I conclude, given my disposition of this case, that neither party is entitled to "prevailing party" status. Accordingly, both parties shall bear their own attorneys' fees and expenses.

CONCLUSION

Based on the foregoing, I find that plaintiff is entitled to recover $51,059.00 in hire/loss of use damages for the period of holdover following the expiration of the charter term. Plaintiff shall recover prejudgment interest pursuant to Paragraph 3.3 of the Charter Party from August 27, 1988. In addition, I find that defendant Pacific Northern is entitled to recover $50,695.93 in overpayments and off-hire costs. All claims for attorneys' fees are denied.