Argued June 3, affirmed November 5, petition for rehearing
denied November 30, 1971

MAY ET AL, *Appellants, v.* CHICAGO INSURANCE
COMPANY ET AL, *Respondents.*

490 P2d 150

*Walter H. Evans, Jr.,* Portland, argued the cause for appellants. With him on the briefs was William D. Peek, Portland.

*Carl R. Neil,* Portland, argued the cause for respondents. With him on the brief were Lindsay, Nahstoll, Hart, Duncan, Dafoe & Krause, Portland, and Brendan J. Connolly, and Mendes & Mount, New York, NY.

McALLISTER, J.

This is a declaratory judgment proceeding brought by Olson Towboat Co. and Charles May seeking a declaration that they are covered as additional insureds under the liability provisions of certain policies of marine insurance issued to the defendant Sause Bros. Ocean Towing Co., Inc., by the sundry insurers named as defendants. The trial court held that plaintiffs were not covered by the policies and both plaintiffs appealed. We affirm.

The plaintiffs claim coverage for their liability resulting from the collision of a barge, while under tow, with a bridge owned by the State of Oregon. In

an action brought by the state in the United States District Court a judgment for damages to the bridge was entered against both May and Olson Towboat, and others. *State of Oregon v. Tug Go-Getter*, 299 FS 269 (D Or 1969). That case is now on appeal to the United States Court of Appeals.

In the present case the parties stipulated to certain facts and also stipulated that they are bound by the facts and legal rulings of the opinion of the federal district court. The following factual summary is taken from the opinion of the federal court and from the stipulation of the parties.

The accident occurred on October 4, 1966, at Bullard's Bridge on the Coquille River upstream from Bandon. The barge J. WHITNEY, which was under bareboat charter to Oliver J. Olson & Company ("Olson"), was being towed from Yaquina Bay to Bandon and thence up the Coquille River to Rogge's Mill, immediately upstream from Bullard's Bridge. The barge was towed as far as Bandon by the tug JEAN NELSON, owned by Olson Towboat.[①] Plaintiff May was employed by Olson Towboat and was the master of the JEAN NELSON.

The JEAN NELSON was not capable of navigating the Coquille River past Bandon, and a smaller barge owned by Olson Towboat was not available at the time. Representatives of Olson had made oral arrangements with Curtis Sause, vice-president of Sause Bros., for a Sause Bros. tug to meet the JEAN NELSON off the bar at Bandon, to sound the bar for the JEAN NELSON as it entered the Coquille River, and

---

[①] The federal district court held that although there was some overlap in the ownership of Olson and Olson Towboat, the two were separate corporations and neither was the alter ego of the other. 299 FS at 273.

to take over the tow of the J. WHITNEY at Bandon and tow the barge through Bullard's Bridge to Rogge's Mill.[2] Pursuant to this arrangement, the tug GO-GETTER met the JEAN NELSON, sounded the bar, and took over the tow of the barge at Bandon. At the request of his employers, John G. Davis, the master of the GO-GETTER, had asked May to come aboard the GO-GETTER and to pilot the tug and barge through Bullard's Bridge. May agreed, but there is no evidence that Olson Towboat, May's employer, knew that May was to do this.

Davis operated the GO-GETTER to a point about halfway between Bandon and the bridge. May then took over the controls and attempted to pass through the bridge. The attempt resulted in the barge colliding with one of the piers or columns of the bridge, causing structural damage.

In the resulting action by the state, the federal district court held that May's negligence was a cause of the collision, and that he was liable.[3] It also held that Olson Towboat was vicariously liable to the state for May's negligence. The portion of the opinion dealing with Olson Towboat's liability is set out in the margin.[4]

---

[2] Although one of the Olson employees who participated in making these arrangements was also an employee of Olson Towboat, it is apparently undisputed that he was acting for Olson. Sause Bros. billed Olson, not Olson Towboat, for the use of the GO-GETTER, and the federal court found that there was a contract of towage between Olson and Sause Bros. 299 FS at 276, note 2.

[3] That court also held Sause Bros. was liable for its own negligence, as well as vicariously as May's temporary employer. 299 FS at 275.

[4]
"Olson Towboat is vicariously liable to the State for Captain May's negligence. One can simultaneously serve two

The GO-GETTER was insured by the defendant insurers under "tug form" policies of marine insurance known as the "McLelland" form. Clause 28 of those policies provides liability coverage for collision of the tug or her tow with structures such as the bridge in the following language:

"And it is further agreed that if the vessel hereby insured and/or her tow shall come into collision or contact with any structure \* \* \* and the Assured and/or Charterers and/or Operators and/or Lessees in consequence thereof \* \* \* shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of any such accident, this Company will pay the Assured and/or Charterers and/or Operators and/or Lessees such proportion of such sum or sums so paid as its subscription hereto bears to the value of the Vessel hereby insured, \* \* \*."

---

masters. Restatement, *supra*, § 226. Williams v. Pennsylvania R.R. Co., 313 F.2d 203, 208-209 (2d Cir. 1963). In operating the GO-GETTER's controls Captain May was serving Olson Towboat as well as Sause.

"Captain May was performing the type of work he customarily performed for Olson Towboat. If an Olson Towboat tug were available, Captain May would unquestionably have been in charge. The tow was owned by a company closely connected to the company that employed him. It was in the interest of the owners of Olson Towboat that the Olson barge complete its assignment.

"Captain May's service on the GO-GETTER was close in time and space to the task, just completed for Olson Towboat, of taking the Olson barge to Bandon. His actions were motivated by a desire to serve Olson Towboat. Captain May believed he was authorized to perform such services, and he had done it in the past.

"Olson Towboat agrees that Captain May was its employee as far as Bandon, but claims his employment ceased when he boarded the GO-GETTER. I disagree. In operating the tug, Captain May remained within the scope of his employment. Olson Towboat may not narrow that scope in retrospect when liability is likely." 299 FS at 276.

The issue in the present case is whether plaintiffs May and Olson Towboat, who have been held liable for damages resulting from the collision of the GO-GETTER's tow with the bridge, are covered as "operators" of the tug under the above-quoted provision of the insurance policies.

At the trial the parties introduced the evidence of experts in the field of marine insurance on the meaning of the term "operators" in Clause 28. After hearing the testimony of plaintiffs' expert witness and reading the depositions of defendants' two experts, the trial court held that neither May nor Olson Towboat was an "operator." The trial court's declaratory judgment read as follows:

### "FACTS

"Captain Charles May was operating the tug GO GETTER only in the sense of a towboat captain physically controlling or directing the control of the tug and its tow. He was acting as a special pilot for a special job, and had been loaned for a particular purpose. He was the servant of both Sause Bros. Ocean Towing Co. and Olson Towboat Co. Neither Captain May nor Olson Towboat Co. had overall operational responsibility for Sause's tug. Its job, crew and overall operation were strictly the responsibility of Sause. Olson Towboat's only relationship to this incident was to allow one of its experienced tug captains to do a favor for Sause on a difficult haul.

### "INTERPRETATION OF POLICY

" 'Assured and/or charterers and/or operators and/or Lessees * * *'

"Note the word 'operators' is used in association with three other words. In this manner the word appears at least 16 times in Tug Form 1706, but never independently. (Once in clause 12, 13 and 15;

twice in clause 27; and 11 times in clause 28, which is the clause relied on by plaintiff). Thus the word 'operators' suggests something more than mere capacity to manipulate or control a vessel.

"The term 'operator' usually refers to a proprietary interest in a vessel. Plaintiff had no such interest in this case. * * *

## "CONCLUSION

"Neither May nor Olson Towboat Co. had any proprietary interest in the tug GO GETTER at the time of the collision.

"The court concludes that there is no coverage under any clause of defendant's insurance policy that would extend to plaintiffs."

Plaintiffs assign as error the trial court's holding that because they had no proprietary interest in the tug, they were not its "operators" within the meaning of the policies.

As a preliminary matter, we consider the scope of our review. Plaintiffs contend, citing *Consolidated Freightways, Inc. v. Flagg,* 180 Or 442, 176 P2d 239, 177 P2d 422 (1947), that on review of declaratory judgment proceedings this court is not bound by the trial court's findings of fact. Defendants respond that even though this court may not be bound by findings of fact in a declaratory judgment proceeding, it normally accords weight to the circuit court's decision.

■■ The parties' contentions on this question are applicable only to declaratory judgment proceedings which are basically equitable in nature. The broad language in *Consolidated Freightways* on which plaintiffs rely, 180 Or at 458, is no longer controlling in all declaratory judgment proceedings. It is now clear that such proceedings will be treated as either legal or

equitable, depending upon their nature. *Mayer v. First National Bank of Oregon,* 260 Or 119, 133, 489 P2d 385, 392 (September 29, 1971); *Oregon Farm Bureau v. Thompson,* 235 Or 162, 179, 378 P2d 563, 384 P2d 182 (1963). We have treated declaratory judgment proceedings to determine coverage under insurance policies as legal in nature, rather than equitable, with the consequence that the trial court's findings of fact in such cases are binding on us if supported by any substantial evidence. *Falk v. Sul America Terrestres,* 255 Or 246, 248, 465 P2d 714 (1970); *Oregon Farm Bureau v. Thompson,* supra, 235 Or at 199, 200-205 (concurring and dissenting opinions on rehearing, representing the views of five members of the court on this question). See, also, *Reif v. Botz,* 241 Or 489, 406 P2d 907 (1965). We cannot, therefore, accept the parties' invitation to review the evidence in this case de novo. We must accept the trial court's findings of fact if those findings have adequate support in the evidence.

■ As a general rule, the construction of a contract is a question for the court and is treated as a matter of law. *Quillin v. Peloquin,* 237 Or 343, 346, 391 P2d 603 (1964); *Bakkensen v. Hancock M. Life Ins. Co.,* 222 Or 484, 493, 353 P2d 558 (1960); *Morey v. Redifer,* 204 Or 194, 213, 282 P2d 1062 (1955). Under certain circumstances, however, there will be questions for the finder of fact in connection with the construction process. In *Libby Creek Logging, Inc. v. Johnson,* 225 Or 336, 339, 358 P2d 491 (1960), we said:

"If the provisions of the contract are plain and unambiguous, it is the function of the court to interpret the contract and declare its legal effect. (Citing cases.)

"If the language of the contract is ambiguous,

or if technical words, terms of art, or local phrases are used, evidence showing the meaning or interpretation of the contract may be admitted. In such event, the jury should determine the intention of the parties. (Citing cases.)"

See, also, *Finchum v. Lyons*, 247 Or 255, 264-265, 428 P2d 890 (1967) and authorities there cited.

The respective functions of the court and jury are summarized by Williston in the following language:

"* * * The general rule is that interpretation of a writing is for the court.

* * * * *

"Where, however, the meaning of a writing is uncertain or ambiguous, and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury. * * *

* * * * *

"The jury's function in the interpretation of documents then will arise wherever, in view of the surrounding circumstances and usages offered in evidence, the meaning of the writing is not so clear as to preclude doubt by a reasonable man of its meaning.

"If the meaning after taking the parol evidence, if any, into account is so clear that no reasonable man could reach more than one conclusion as to the meaning of the writing under the circumstances, the court will properly decide the question of fact for itself as it may any question of fact which is equally clear.

"Also, if such uncertainty or ambiguity as there may be in a writing does not arise from, and cannot be solved by, any special local meaning of the words used, or any usage or surrounding circumstances, the court will deal with the matter itself, as the difficulty of interpretation must be solved

from the writing alone." 4 Williston on Contracts (3d ed 1961) 649, 652, 660-663.

The author of the Annotation at 65 ALR 648 makes a further theoretical distinction between the functions of the court and the jury in cases where extrinsic evidence has been introduced to aid in interpretation:

"* * * When, however, extrinsic evidence of surrounding circumstances or other facts bearing upon intention have been introduced, a question of fact may arise which must be submitted to the jury. Theoretically, this does not necessitate the invasion of the court's province in construing written contracts, but merely requires a construction by the court in the light of the facts found by the jury from the extrinsic evidence. This function the court may still perform by instructing the jury to return a finding upon the question of fact arising from the extrinsic evidence submitted to them, and itself determining the construction in the light of the fact so found. Or it may submit the matter of interpretation to the jury under binding instructions as to what construction should be put upon various hypothetical states of fact which they may find. * * *"

Our own cases appear not to have taken into account any such theoretical distinction, perhaps because, as the author of the annotation suggests, the resolution of the issue of fact so often determines the only issue of construction between the parties.

In the present case the defendants offered evidence to show that the term "operators" had a generally understood meaning in maritime usage. We have held that evidence of a special meaning within the trade within which the transaction arose is always admissible, *Hurst v. Lake & Co., Inc.*, 141 Or 306, 310-317, 16 P2d 627 (1933), and have treated the determination of the existence of a trade custom or usage as one for the trier of fact. *Dorsey v. Oregon Motor Stages*, 183

Or 494, 194 P2d 967 (1948); *Green Mt. L. Co. v. C. & N. R. R.*, 141 Or 188, 192, 16 P2d 1106 (1932).

Defendants' experts testified that the McLelland tug form was developed for use in the Pacific Northwest shortly after the end of World War II, and that the word "operators" in that form covered the situation, common at that time in the area, in which tugs were loaned by one company to another without a formal charter or lease. Such loans were the result of a shortage of vessels after the war, and were usually made on a short-term or single trip basis. The borrower in such a situation was considered to be the "operator" of the tug under the terms of the policy.

The experts also testified that the term does not include the tug's master and crew as individuals—even though they may be handling the tug's controls, they are not considered to be its "operators." Mr. Galbraith, one of defendants' experts, testified:

"Q  I will ask you first, is there any understanding in the trade as to who would be defined as 'Operators' in the situation I just posed to you?
"A  Yes.

"Q  All right. What is that understanding?
"A  Corporate entity.

"Q  Which corporate entity?
"A  Of the borrowing corporate entity.

"Q  What about the Master and crew of the borrower who are operating the tug, would they be Operators?
"A  No.

"Q  Similarly is there any practice in the insurance industry with respect to whether or not the Master and crew of the owner of the tug are Operators—is there any practice?
"A  They are not the Operators.
                    *  *  *  *  *

"THE WITNESS: I have never heard the word 'Operator' in marine usage employed to mean anything other than what I'm terming the corporate entity."

On cross-examination he testified:

"Q In McLelland Form 1706 it refers to 'Assured and/or Charterers and/or Operators and/or Lessees.'

"So I take it you would agree with me that the phrase 'Operator' does not mean the Lessee, it does not mean the Charterer or the Owner?
"A That's right.

"Q So it means some other entity, corporate entity, legally responsible for the operation of the vessel?
"A That's right."

The introduction of evidence such as this raised an issue of fact as to the trade meaning of the term "operators" in the marine insurance field. The trial court's finding that "the term 'operator' usually refers to a proprietary interest in a vessel" must be considered a finding of fact on this issue.

Plaintiffs contend that the term "operators" should be read to include anyone who is held liable for damages resulting from the tug's operations.[9] There is some support for this view in the testimony of the expert witnesses, at least as it applies to a busi-

---

[9] They also contend the term includes an individual who is manually operating the controls of the vessel, in the sense that the driver of an automobile is considered to be its "operator." See Schaffer v. Mill Owners Ins. Co., 242 Or 150, 153-155, 407 P2d 614 (1965). They conceded on oral argument, however, that the expert testimony was to the contrary and that coverage for the individual at the controls of the vessel is not generally provided under the vessel's hull policy. Plaintiffs' main contention on appeal is that the policies provided coverage for Olson Towboat.

ness entity such as Olson Towboat. As we have pointed out above, however, we are bound by the trial court's finding of the existence of a trade usage if there is evidence to support that finding. While the evidence might support a different finding as well, we do not weigh the evidence or reach an independent conclusion on this question. There was evidence to support the trial court's finding that the term implies a "proprietary" interest in a vessel.

Considering the c o n t e x t in which the word "operators" is used in the policy in question, and the nature of the testimony of defendants' experts, it is likely that the trial court did not use the term "proprietary interest" to mean pertaining to ownership in the strict sense, but rather with a broader meaning. In Webster's New International Dictionary of the English Language, 2d ed Unabridged, "proprietor" is defined as:

> "One who has the legal right or exclusive title to anything, whether in possession or not; an owner; sometimes, especially in statutory construction, in a wider sense a person having an interest less than an absolute and exclusive right, as the usufruct, or present control and use, of property."[⊗]

The trial court was justified in finding that in maritime usage the "operator" of a vessel is one who has the present use and control of the vessel. Defendants'

---

[⊗] In various contexts, courts have recognized that the word "proprietor" may include those with an interest in the thing in question which is less or other than full ownership. See, e.g., Birmingham Ry., Light & Power Co. v. Milbrat, 201 Ala 368, 78 So 224, 227-228 (1918); Commonwealth v. Skatt, 162 Mass 219, 38 NE 499, 500 (1894); Pennsylvania Co., Etc. v. City of Philadelphia, 346 Pa 406, 31 A2d 137, 141 (1943); Adams v. Cumberland Inn Co., 117 Tenn 470, 101 SW 428, 430 (1906); Winsor v. German Savings & Loan Soc., 31 Wash 365, 72 P 66, 67 (1903); Thompson v. City of Eau Claire, 269 Wis 76, 69 NW2d 239, 241 (1955).

experts testified that the present tug insurance form, employing this term, came into use at a time when it was common practice for tug companies to borrow each other's tugs on a short-term basis without any formal charter or lease, and that the coverage for "operators" extended to the borrower in such a situation. The testimony that "operator" means the "corporate entity legally responsible for the operation of the vessel" could be reasonably understood as an attempt to state in general terms the nature of the interest of one who has the use and control of a vessel or a managerial interest in its operation. Although this testimony is susceptible of other interpretations, and although defendants' experts were not entirely consistent in their attempts to define "operators" in the maritime context, the trial court's finding has substantial support in their testimony.

Given the fact that, in maritime parlance, the operator of a vessel is the entity which has the use and control of that vessel, it is clear that the word was used in this sense in the policy. In addition to the testimony that the term was intended to cover such entities, the policy itself demonstrates this intent. In a portion of Clause 28 which is not involved in this case, the policy provides, in connection with liability coverage in cases of collision with another vessel:

"* * * but when both Vessels are to blame, then unless the liability of the Owners and/or Charterers and/or Operators and/or Lessees of one or both of such Vessels becomes limited by law, claims under this clause shall be settled on the principle of cross-liabilities as if the Owners and/or Charterers and/or Operators and/or Lessees of each Vessel had been compelled to pay to the Owners and/or Charterers and/or Operators and/or Lessees of the other of such Vessels such one-half

or other proportion of the latter's damages as may
have been properly allowed in ascertaining the
balance or sum payable by or to the Assured and/or
Charterers and/or Operators and/or Lessees in
consequence of such collision."

This language appears to assume that the "operators"
of each vessel have an interest in the vessel which
would entitle them to compensation for damages which
it might suffer in a collision. A bailee, whether by
formal or informal arrangement, would have such an
interest. One who was merely liable for damages
caused by the negligent operation of the vessel be-
cause its employee happened to be at the controls
would not.

This construction of the term in Clause 28 is con-
sistent with its usage throughout the policy form. As
the trial court noted, the word is never used except
in conjunction with "Assured" (or "Owners"), "Char-
terers" and "Lessees." All these terms have in com-
mon an element of right of control over the total oper-
ation of the vessel arising out of an ownership or
managerial interest. The trial court found that "oper-
ators" has a meaning within the trade which includes
a similar element. Taking the policy as a whole, it
appears that the term is used in that sense throughout.

The trial court held that neither May nor Olson
Towboat had such an interest in the GO-GETTER.
This holding is amply supported in the evidence. As
to May, no other finding could be made. He was acting
simply as the temporary employee of the tug's owner,
Sause Bros., on a job Sause Bros. had contracted to
do for Olson, the owner of the barge. As to Olson Tow-
boat, the evidence also clearly supports the trial court's
finding. The federal district court found (a finding

to which the parties bound themselves by stipulation) that there was a contract of towage between Sause Bros. and Olson. Olson Towboat was a stranger to this contract. When the GO-GETTER left Bandon, with the barge in tow, John Davis, a Sause Bros. employee, was at the controls and did not turn the controls over to May until the tug was approaching the bridge. The district court held that May became Sause Bros.' employee when he was at the tug's controls. The evidence supports a finding that Sause Bros. had exclusive control over the tug through its employee Davis and then through its temporary employee May, and that this control was never relinquished to or shared with Olson Towboat. The district court's reasons for holding Olson Towboat vicariously liable for May's negligence, quoted in note 4 above, have to do with the relationships among the parties. There is no suggestion that anyone but Sause Bros. had a right to direct May's operation of the tug at the time of the accident, or that Olson Towboat had any rights or interest in the GO-GETTER itself.

The trial court's findings of fact were supported by substantial evidence and its legal conclusions were correct in light of those findings. The judgment is affirmed.