No. 29      July 17, 2025      23

IN THE SUPREME COURT OF THE
STATE OF OREGON

Peter LOWES,
*Respondent on Review,*

*v.*

Amy THOMPSON,
fka Amy Lowes,
*Petitioner on Review.*

(CC 21CV28283) (CA A178568) (SC S071016)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 14, 2024.

Nathan Gabriel Steele, The Steele Law Firm, Bend, argued the cause and filed the briefs for petitioner on review.

Julie A. Smith, Cosgrave, Vergeer, Kester, LLP., Portland, argued the cause and filed the brief for respondent on review.

BUSHONG, J.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the Court of Appeals for further proceedings.

James, J., concurred and filed an opinion, in which Bushong, J., joined.

_____

   * Appeal from Deschutes County Circuit Court, Bethany P. Flint, Judge. 331 Or App 406, 546 P3d 311 (2024).

**BUSHONG, J.**

This civil case requires us to decide whether a nondisparagement clause in a stipulated divorce judgment defeated a special motion to strike under Oregon's anti-SLAPP statute, ORS 31.150.[1] Plaintiff Lowes alleged that his ex-wife, defendant Thompson, had breached the nondisparagement clause in the stipulated judgment of dissolution of their marriage when, as a candidate for political office, she spoke to a reporter about an incident of domestic violence, describing Lowes as her "abuser." The trial court granted Thompson's special motion to strike the breach of contract claim under the anti-SLAPP law. The Court of Appeals reversed, concluding that Thompson had waived the right to speak disparagingly about her ex-husband and that such a waiver alone defeated her anti-SLAPP motion to strike. *Lowes v. Thompson*, 331 Or App 406, 546 P3d 311 (2024). We allowed Thompson's petition for review, and we now reverse the Court of Appeals' decision in part and remand to that court for further proceedings.

The anti-SLAPP statute describes a two-step burden shifting procedure for early dismissal of nonmeritorious claims that arise out of speech in certain circumstances. At step one, a defendant filing an anti-SLAPP special motion to strike has the initial burden of showing that the claim "arises out of" speech that is covered by the statute. ORS 31.150(2). If so, the burden then shifts to the plaintiff at step two to establish that there is "a probability that the plaintiff will prevail" on the claim. ORS 31.150(1), (4). Here, the Court of Appeals determined that, although Thompson had met her initial burden, the nondisparagement clause alone defeated her motion, reaching that conclusion without evaluating at step two whether Lowes had met his burden of establishing a probability that he would prevail on the claim. The court reasoned that such an evaluation was unnecessary because the nondisparagement clause in effect waived the procedural protections in the anti-SLAPP statute.

---

[1] SLAPP is an acronym for strategic lawsuits against public participation. *Neumann v. Liles*, 358 Or 706, 722, 369 P3d 1117 (2016). ORS 31.150 is commonly referred to as an anti-SLAPP statute because it provides for early dismissal of nonmeritorious claims that are based on various ways of participating in public discourse as described in the statute.

We disagree. We do not construe the nondisparagement clause to waive the second step in the analysis that is required by the anti-SLAPP statute.[2] Thus, after concluding that Thompson had met her initial burden, the Court of Appeals was required to determine whether the trial court had erred in concluding at step two that Lowes had failed to meet his burden of establishing that he had a probability of prevailing on the claim. As a result, we reverse the Court of Appeals' decision in part and remand this case to that court to decide that issue in the first instance.[3]

## BACKGROUND

We take the historical and procedural facts from the trial court record. The parties married in August 2013. In 2016, Thompson filed a petition for a restraining order against Lowes under the Family Abuse Prevention Act (FAPA), ORS 107.700 - 107.735, alleging that Lowes had assaulted and strangled her during two separate incidents of domestic violence. The trial court granted that petition, and Lowes requested a hearing, indicating that he objected to the restraining order. Lowes later withdrew his objection, and the restraining order remained in effect.[4]

---

[2] Commentators have noted a distinction between contract *interpretation* and contract *construction*. Interpretation involves determining the intended meaning of the words used in a contract, while construction involves determining the legal effect given to those words. *See* Richard A. Lord, 11 *Williston on Contracts* § 30.1, 2-17 (4th ed 1990) (supplemented periodically) (explaining the distinction); Margaret N. Kniffin, 5 *Corbin on Contracts* § 24.3, 7-11 (rev ed 1998) (supplemented periodically) (same). This court has tended to use the terms "interpretation" and "construction" interchangeably. *See Tarlow v. Arnston*, 264 Or 294, 299, 505 P2d 338 (1973). In this opinion, we use the terms "construe" and "construction" when discussing the legal effect of the nondisparagement clause and the terms "interpret" and "interpretation" when discussing the parties' intent.

[3] Lowes also contends on review that, even if the anti-SLAPP law permitted dismissal of his breach of contract claim based on Thompson's statements on matters of public interest, the trial court erred in dismissing the claim because part of that claim was premised upon other allegedly disparaging statements that are not protected by the anti-SLAPP law. We leave that argument for the Court of Appeals to address on remand, if necessary.

[4] A FAPA restraining order is generally effective for two years, ORS 107.716(6), 107.718(3), and it can be renewed for an additional two years, ORS 107.725(1). The trial court later granted, preliminarily, Thompson's request to renew the restraining order. Lowes objected and requested a hearing on the requested renewal. Ultimately, the parties stipulated to the dismissal of Thompson's petition to renew the restraining order.

Seven days after Thompson had filed for a restraining order, she reported the domestic violence incidents to the Bend Police Department. The police investigated, and the Deschutes County District Attorney's office filed an information charging Lowes with two counts of strangulation constituting domestic violence and two counts of fourth-degree assault constituting domestic violence based on those incidents. Lowes eventually pleaded guilty to one count of fourth-degree assault, stating in his plea petition that he was pleading guilty because, on one occasion, he "knowingly caused physical injury" to Thompson. The court accepted the guilty plea and granted Lowes's petition to enter the court's Domestic Violence Deferred Sentencing Program. Upon successfully completing that program, the court allowed Lowes to withdraw his guilty plea, and all charges were dismissed.

Lowes filed a petition for dissolution of the parties' marriage, and, in May 2017, the court entered a stipulated dissolution judgment. The parties did not have any children together, and the dissolution judgment primarily addressed the distribution of their property and allocation of their debts. The judgment also included a broad release of all claims that Thompson had or claimed to have against Lowes when the judgment was entered.[5] Finally, the judgment included a nondisparagement provision, which reads:

> "MUTUAL NON-DISPARAGEMENT. Neither party shall make or knowingly encourage any other person to make any public or private statement, whether written or oral, that disparages, defames, is derogatory about, or misrepresents the other party or one of their business interests."

In 2018, Thompson ran for election to the Deschutes County Commission. Lowes contributed $2,000 to the campaign of Thompson's opponent. Oregon Public Broadcasting (OPB) then obtained through public records requests the police reports addressing Lowes's alleged assaults on Thompson, his confession to law enforcement, the criminal charges that were filed against him, and his subsequent

---

[5] Lowes explained in the affidavit that he submitted in opposition to Thompson's special motion to strike that the release was broadly worded to include all claims arising from or relating to the abuse allegations that had formed the basis of the FAPA restraining order and that Thompson had reported to the police.

guilty plea. OPB then contacted Thompson, asking her to comment on Lowes's campaign contribution to her opponent. Thompson answered OPB's questions, and an article posted on OPB's website quoted her as stating, "I'm disappointed my opponent would choose to take a sizable donation from my abuser. I never had any intention of politicizing this." According to the article, Thompson described Lowes's conduct as "egregious," stating that Lowes had "strangled" her after he had gained access to the room where she had barricaded herself by climbing onto the roof of their house and jumping onto the third-floor balcony.

Lowes then filed this action, asserting a breach of contract claim against Thompson and a defamation claim against OPB.[6] Lowes alleged, among other things, that Thompson had breached the nondisparagement clause in the stipulated judgment when, in the OPB interview, she described Lowes as her "abuser" and stated that he had "strangled" her. Thompson filed a special motion to strike the breach of contract claim pursuant to ORS 31.150, Oregon's anti-SLAPP law, asserting that the claim arose from speech in connection with a public issue or issue of public interest that is covered by ORS 31.150(2).[7] Thompson combined her special motion to strike with an alternative motion to dismiss the breach of contract claim under ORCP 21 A(1)(h) for failure to state ultimate facts sufficient to constitute a claim.[8]

Lowes offered three arguments in response to the special motion to strike. First, he contended that Thompson had "failed to identify any legitimate 'issue of public interest' or 'public issue' that was served by detailing an alleged attack and claiming to be strangled." Second, he contended that, by stipulating to a dissolution judgment that included

---

[6] Lowes later dismissed the defamation claim that he had asserted against OPB.

[7] As noted above, Lowes included as part of a single breach of contract claim allegations that Thompson had made other disparaging statements about him to persons other than the OPB reporter. Thompson's special motion to strike was based on the statements that she had made to OPB. The trial court and the Court of Appeals addressed that aspect of the claim, and we confine our review to that issue.

[8] When Thompson filed her motion, ORCP 21 A(1)(h) was numbered ORCP 21 A(8). We refer to the rule as currently numbered in this opinion.

a nondisparagement clause, Thompson had "waived" any rights that she may have under the anti-SLAPP statute. Third, Lowes argued that the evidence that he had submitted was sufficient to show a probability that he would prevail on his claim.

In response, Thompson contended that she had met her initial burden under the anti-SLAPP statute, but that Lowes had failed to meet his burden at step two of the analysis. Thompson contended that Lowes had failed to meet his burden as to each element of his breach of contract claim, but she focused specifically on the absence of evidence establishing that any breach of the nondisparagement clause had caused Lowes any recoverable damages. Thompson pointed out that the monetary damages that Lowes sought in the complaint—$1.4 million—was roughly equivalent to the value of the property that Thompson had received pursuant to the dissolution judgment. She contended that Lowes had failed to produce any evidence that a breach of the nondisparagement clause had caused him to suffer those damages.

The trial court granted Thompson's special motion to strike, concluding that the breach of contract claim "arises out of" speech that was protected by the anti-SLAPP statute. Specifically, the court concluded that Thompson's statements to OPB were protected because whether a political candidate is a survivor of domestic violence is an issue of public interest. That conclusion shifted the burden to Lowes to establish a probability that he would prevail on his claim. The trial court did not expressly address Lowes's waiver argument in determining whether he had met his burden. Instead, it concluded that Lowes had failed to present substantial evidence of causation and damages sufficient to support a *prima facie* case. The trial court also granted Thompson's alternative ORCP 21 A motion to dismiss the breach of contract claim. Based on those rulings, the trial court entered a judgment dismissing the breach of contract claim without prejudice.

Lowes appealed, arguing that the trial court had erred in granting Thompson's special motion to strike his breach of contract claim under the anti-SLAPP statute. Lowes did not assert on appeal that the trial court had

erred in concluding that his claim arose out of speech that was protected by the anti-SLAPP statute.[9] Instead, he contended that the trial court erred because (1) Thompson had waived the right to speak disparagingly about Lowes when she agreed to the nondisparagement clause; (2) that waiver defeated Thompson's special motion to strike under the anti-SLAPP statute; (3) Lowes did not need to offer evidence of causation and damages to support a *prima facie* case because damage is "presumed" in this breach of contract case; and (4) in any event, Lowes had offered evidence that he had been damaged as a result of the OPB article. Lowes also contended that the trial court erred in granting Thompson's ORCP 21 A(1)(h) motion to dismiss.

The Court of Appeals agreed with Lowes in part and reversed the judgment entered by the trial court. It determined that "the trial court was correct in concluding that Thompson met the initial burden to show that the breach of contract claim against which the motion [was] made arises out of one or more protected activities." *Lowes*, 331 Or App at 411. However, the court agreed with Lowes that "unchallenged evidence of a waiver of the rights protected by the anti-SLAPP statute can satisfy a plaintiff's burden to defeat an anti-SLAPP motion once a defendant has satisfied the burden at the first step." *Id.* The court explained that, when the parties contractually agreed not to make disparaging statements, "they necessarily waived the rights—constitutional and statutory—to make them, even if those statements would otherwise qualify" for the protections of the anti-SLAPP statute. *Id.* at 412. The court concluded that "the parties' prior contractual agreement not to engage in the very speech that is the subject of the anti-SLAPP motion is sufficient for Lowes to satisfy his burden in response to the special motion to strike." *Id.*

Thus, the court explained that the trial court "should have ruled that Lowes's showing of a waiver of protected rights was sufficient to defeat Thompson's anti-SLAPP motion." *Id.* The court stated that that conclusion

_____

[9] Specifically, Lowes did not argue on appeal, as he had in the trial court, that Thompson's statements to OPB fell outside the scope of the anti-SLAPP law's protection because they did not address a public issue or a matter of public interest.

made it "unnecessary" for the court "to reach the second anti-SLAPP step and consider the likelihood of Lowes's breach of contract claim succeeding on the merits." *Id.* The court indicated that its conclusion was "consistent with" a decision of the California Supreme Court. *Id.* at 412-13 (citing *Navellier v. Sletten*, 29 Cal 4th 82, 52 P3d 703 (2002)). As a result, the court did not address the trial court's determination that the evidence that Lowes had submitted on "causation and damages" was insufficient to meet his burden to show a probability of prevailing on his claim.[10]

    We allowed review to decide whether a nondisparagement clause in a stipulated divorce judgment defeated a special motion to strike under the anti-SLAPP statute.

## DISCUSSION

    As noted above, the Court of Appeals determined that the nondisparagement provision in the stipulated divorce judgment amounted to both a waiver of the right to speak disparagingly about the other party and a waiver of the statutory protections provided by the anti-SLAPP law. According to the Court of Appeals, those conclusions alone defeated Thompson's special motion to strike, making it unnecessary for the court to address at step two of the analysis whether Lowes had demonstrated a probability that he would prevail on his claim. On review, we must construe the nondisparagement provision and, to some extent, interpret the anti-SLAPP statute. We review the construction of a contract and the interpretation of a statute for legal error. *See State ex rel Rosenblum v. Living Essentials, LLC*, 371 Or 23, 33, 529 P3d 939 (2023) (statutory interpretation presents "questions of law that we review for legal error"); *May v. Chicago Ins. Co.*, 260 Or 285, 292, 490 P2d 150 (1971) ("As a general rule, the construction of a contract *** is treated as a matter of law.").

    As we will explain, we conclude that the nondisparagement clause did not waive Thompson's right to the procedural protections afforded by the anti-SLAPP statute, and thus the clause itself did not defeat her special motion

---

[10]  With respect to Thompson's alternative ORCP 21 A(1)(h) motion to dismiss, the Court of Appeals concluded that Lowes had "adequately alleged causation and damages, and the trial court therefore erred in granting Thompson's motion to dismiss the complaint for failure to state a claim." *Id.* at 415.

to strike.[11] Accordingly, we reverse the Court of Appeals on that issue and remand this case to the Court of Appeals to address in the first instance the trial court's determination that Lowes had failed to meet his burden of establishing a probability that he would prevail on his claim.

To determine whether the Court of Appeals erred in construing the nondisparagement clause to, in effect, waive the procedural protections provided by the anti-SLAPP statute, it is helpful to start by summarizing how the anti-SLAPP statute applies in this context.

Oregon's anti-SLAPP statute "creates an expedited procedure for dismissal of certain nonmeritorious civil cases without prejudice at the pleading stage." *Neumann v. Liles*, 358 Or 706, 723, 369 P3d 1117 (2016). The statute seeks "to minimize the effect of strategic suits intended to deter persons from expressing their views." *Handy v. Lane County*, 360 Or 605, 612 n 4, 385 P3d 1016 (2016). The goal "is to permit defendants who are targeted for their [protected] statements to end such suits quickly and with minimal expense." *Id.* The statute provides for a two-step burden shifting approach. *Id.* at 612 (describing that approach).

At step one, under subsection (1) of ORS 31.150, a defendant may file a "special motion to strike" a claim in a civil action "described in subsection (2)" of the statute. Subsection (1) further provides that the court "shall grant" the motion unless, at step two, the plaintiff "establishes in the manner provided by subsection (4)" that "there is a probability that the plaintiff will prevail on the claim." Subsection (2) provides that the special motion to strike may be made against any claim that "arises out of" (a) oral or written statements or documents submitted in a legislative, executive, or judicial proceeding or other proceeding authorized by law; (b) statements or documents "submitted[] in connection with" an issue under consideration or review by a legislative, executive, or judicial body or other proceeding authorized by law; (c) statements or documents "presented, in a place open

---

[11] Our conclusion that the nondisparagement clause did not waive Thompson's right to the procedural protections afforded by the anti-SLAPP statute makes it unnecessary for us to decide whether the clause waived Thompson's constitutionally protected free speech rights in general or her right to make truthful—but perhaps disparaging or derogatory—statements about Lowes.

to the public or a public forum in connection with an issue of public interest"; or (d) any other conduct "in furtherance of the exercise of the constitutional right of assembly, petition or association or the constitutional right of free speech or freedom of the press in connection with a public issue or an issue of public interest." ORS 31.150(2)(a) - (d).

Under subsection (4), if the defendant filing a special motion to strike meets their "initial burden" of showing that the claim "arises out of" a statement, document, or conduct described in subsection (2), then at step two of the analysis "the burden shifts to the plaintiff" to establish that there is "a probability that the plaintiff will prevail on the claim" by presenting "substantial evidence to support a prima facie case." ORS 31.150(4).

Thus, as relevant here, Oregon's anti-SLAPP statute provides a two-step, burden shifting procedure for Thompson to seek an early dismissal of Lowes's breach of contract claim. At step one, Thompson had the initial burden of establishing that the claim "arises out of" statements described in subsection (2) of ORS 31.150. As noted above, the trial court concluded that Lowes's breach of contract claim "arises out of" the statements that Thompson made to OPB about her experience with domestic violence, that those statements addressed a public issue or an issue of public interest, and thus, the statements were within the scope of subsection (2) of ORS 31.150. That satisfied Thompson's initial burden and shifted the burden to Lowes to establish at step two that there is a "probability that [he] will prevail on the claim" by presenting "substantial evidence to support a prima facie case." ORS 31.150(4). The trial court determined that Lowes had failed to meet his burden.

On appeal, Lowes did not challenge the trial court's conclusion that his claim arose out of Thompson's statements to OPB, that those statements addressed a public issue or an issue of public interest, and that Thompson therefore met her initial burden at step one of the analysis. Instead, Lowes relied on his waiver argument and his contention that the evidence that he submitted was sufficient to meet his burden at step two. As noted above, the Court of Appeals concluded—after noting that Thompson had met her

burden at step one—that the nondisparagement clause was a "waiver" that defeated the special motion to strike without evaluating at step two whether Lowes had met his burden of establishing a probability that he would prevail on the claim.

Thus, the issue presented on review in this court is whether the Court of Appeals erred in concluding that the nondisparagement clause alone was sufficient to defeat Thompson's special motion to strike after she met her initial burden. Echoing the Court of Appeals, Lowes contends on review that the nondisparagement clause defeated Thompson's special motion to strike because it, in effect, "waived" the procedural protections provided by the anti-SLAPP statute. And according to Lowes, that "waiver" precluded Thompson's special motion to strike, making it unnecessary to analyze whether Lowes met his burden of establishing that he had a probability of prevailing on the claim.

As we will explain, we do not interpret the nondisparagement clause to clearly reflect the parties' intent to waive the procedural protections of the anti-SLAPP statute, nor do we construe that clause to have the legal effect of defeating Thompson's motion. We begin with the waiver argument.

A waiver is "the voluntary relinquishment of a known right." *Bennett v. Farmers Ins. Co.*, 332 Or 138, 156, 26 P3d 785 (2001). We have recognized that waivers of existing constitutional and statutory rights "may be expressed through contract terms[.]" *Assn. of Oregon Corrections Emp. v. State of Oregon*, 353 Or 170, 183, 295 P3d 38 (2013). However, a contractual provision that waives constitutional or statutory rights "must clearly indicate an intention to renounce" those rights. *Id.* (quoting *Johnson v. Swaim*, 343 Or 423, 431, 172 P3d 645 (2007), and *Great American Ins. v. General Ins.*, 257 Or 62, 72, 475 P2d 415 (1970) (some internal quotation marks omitted)).

Thus, the issue presented here is whether the nondisparagement clause in the parties' stipulated divorce judgment clearly indicates Thompson's intention to waive the early dismissal procedure provided by the anti-SLAPP statute. As we will explain, we do not interpret the nondisparagement clause—when considered in the context of the

stipulated divorce judgment—to clearly indicate that either party intended to relinquish their right to the procedural protection of that statute, nor do we construe the clause to have that legal effect.

The text of the nondisparagement clause does not use the word "waiver," nor is it worded as a relinquishment of either party's existing statutory rights. Rather, it is worded as a mutual promise that neither party "shall make" disparaging comments about the other.[12] The nondisparagement clause says nothing about either party's existing statutory rights, including the right to seek early dismissal of a non-meritorious claim under the anti-SLAPP statute. Indeed, it does not mention that statute at all. Instead, the clause broadly states that the parties mutually agree not to "make any public or private statement, whether written or oral, that disparages, defames, is derogatory about, or misrepresents the other party or one of their business interests."

To determine the intended meaning of that provision, we must examine it in the context of the stipulated judgment and the purposes it serves. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (court determines the intended meaning of a disputed contractual provision by examining its text "in the context of the document as a whole"). Here, the stipulated judgment dissolves the parties' marriage, distributes their marital property, allocates their debts, and releases all claims that Thompson had against Lowes, including claims based on her allegations of domestic violence and abuse.

The context of the nondisparagement clause further supports the conclusion that the parties did not intend

---

[12] Although some contractual promises can be waivers, principles of contract law generally distinguish contractual promises from waivers. *See Bennett*, 332 Or at 150, 156 (noting that a contract is a legally enforceable promise or set of promises supported by adequate consideration, whereas a waiver "can be accomplished unilaterally, and it need not be supported by consideration"); Richard A. Lord, 1 *Williston on Contracts* § 1:2, 10 (4th ed 1990) (defining "promise" as a "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made"); Timothy Murray, 8 *Corbin on Contracts* § 40.1 (Matthew Bender 2025) (noting the traditional definition of "waiver" as "the intentional relinquishment or abandonment of a known right" but also noting that the field of waiver "has become the equivalent of a juristic free-for-all").

to waive their existing anti-SLAPP rights. The stipulated divorce judgment includes a release provision that is worded as a voluntary relinquishment of any claim that Thompson may have against Lowes, including claims based on her allegations of abuse, arising prior to the execution of the stipulated judgment.[13] The judgment also includes a nonwaiver provision that describes two circumstances that the parties did *not* want to be treated as waivers.[14]

The nondisparagement clause, by contrast, does not utilize words commonly used for a release or waiver that relinquishes existing statutory rights. As we have noted, it is worded as a mutual promise that "[n]either party shall make" any disparaging statements about the other. Although the parties mutually agreed not to disparage each other, we see no evidence in the text of the clause, considered in the context of the stipulated dissolution judgment, that they clearly intended to waive their right to seek early dismissal of a nonmeritorious disparagement claim under the procedure provided in the anti-SLAPP statute.

Lowes contends that, even if the words of the nondisparagement clause did not clearly reflect the parties' intent

---

[13] The release provision states:

"RELEASE OF ALL CLAIMS. As a material inducement for Husband entering into this stipulated judgment, Wife does hereby, for herself and her heirs, successors, assigns, and relatives by blood or marriage, in her capacity as an individual and as a member of any current or future class, forever releases Husband, his agents, insures, assigns, business interests and all persons acting by, through, under or in concert with any of them (collectively, the "Releasees") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, any claims for injury, which Wife now has or claims to have, or in which Wife any time herein may have or may claim to have against each of any of the Releasees, arising prior to execution of this stipulated judgment. This release does not apply to an action by Wife to enforce the provisions of this general judgment of divorce."

[14] The nonwaiver provision states:

"WAIVER OF STRICT PERFORMANCE. The failure of either party to insist on strict performance of any provision of this judgment shall not be deemed a waiver of any right to insist on strict performance of such provision or of any other provision of this judgment at any time; neither shall any waiver by either party as to any breach of any provision be a waiver of any succeeding breach of that provision or any other provision."

to waive the procedural protections of the anti-SLAPP statute, the clause nonetheless had that legal effect. Lowes cites cases from other jurisdictions that support the general proposition that a contractual provision can, in effect, waive the protection of a state's anti-SLAPP law. *See, e.g.*, *Waterways at Bay Pointe Homeowners Ass'n, Inc. v. Waterways Dev. Corp.*, 19 NYS3d 536, 132 AD3d 975 (NY App Div 2015); *Johannesen v. Eddins*, 963 NE2d 1061 (Ill App Ct 2011); *Pennsbury Village Assocs., LLC v. Aaron McIntyre*, 608 Pa 309, 11 A3d 906 (2011); *Middle-Snake-Tamarac Rivers Watershed Dist. v. Stengrim*, 784 NW2d 834 (Minn 2010); *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass 156, 691 NE2d 935 (1998).

Those cases all addressed the effect of contractual provisions in completely different contexts, where the contractual provisions were either clearly intended to waive the applicable statutory protection, or provided a substantial basis for overcoming that protection.[15] None of those cases involved a more general nondisparagement clause in a divorce judgment, and, more importantly, none of those cases involved construing a contractual provision to give it a legal effect that was not clearly intended by the parties.

As we have already explained, we do not interpret the nondisparagement clause in the stipulated divorce judgment to be a clear statement of the parties' intent to waive the procedural protection in the anti-SLAPP statute. Lowes

---

[15] *See Waterways*, 19 NYS3d at 542, 132 AD3d at 980 (concluding that homeowners' association's agreement not to oppose construction combined with evidence that it vigorously opposed a developer's attempts to obtain a building permit provided a "substantial basis in fact and law" for developer's claim (internal citations and quotation marks omitted)); *Pennsbury Village*, 608 Pa at 325, 11 A3d at 916 (holding that defendant was not immune from suit for breaching his agreement not to oppose a township's plans to locate access roads to defendant's property, because the parties' contract "manifest[s] [defendant's] intent" not to oppose the access road locations); *Middle-Snake-Tamarac*, 784 NW2d at 842 (affirming denial of anti-SLAPP special motion to dismiss a claim that defendant had breached a settlement agreement providing that he would not oppose a flood control project, because defendant had "contractually agreed not to hinder the establishment of" the flood control project); *Duracraft*, 427 Mass at 167-68, 691 NE2d at 943-44 (concluding that there was a "substantial basis" for concluding that a former employee had breached a nondisclosure agreement when he testified before the federal Trademark Trial and Appeal Board). In one case, the court reversed a dismissal under the statute because "issues of material fact exist[ed] as to whether defendant actually entered into an agreement and, if so, what he actually agreed to do." *Johannesen*, 963 NE2d at 1066.

does not cite any Oregon cases holding that statutory protections are, in effect, waived absent a clear expression that the parties intended to waive those protections, and none of the cases Lowes cites from other jurisdictions support construing a contractual nondisparagement clause to have that legal effect.

Lowes also relies on the California Supreme Court's statement in *Navellier*, 29 Cal 4th at 94, 52 P3d at 712, that "a defendant who in fact has validly contracted not to speak or petition has in effect 'waived' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract." The Court of Appeals agreed, *Lowes*, 331 Or App at 412-13 (citing *Navellier*), but we do not. The California Supreme Court decided *Navellier* in 2002, so we consider it only for its persuasive value.[16] And *Navellier*'s broad statement that a contractual provision in effect "waive[s]" the right to the anti-SLAPP statute's protection has little persuasive value because that statement was not necessary to the California Supreme Court's decision in that case.

The special motion to strike that was at issue in *Navellier* arose in the context of a business dispute over the management of an investment fund that led to two separate lawsuits.[17] In the second lawsuit, the trial court denied

---

[16] Oregon "modeled its anti-SLAPP statute on California's" law. *Handy*, 360 Or at 618. As a result, we presume that "the legislature intended to follow the California cases that existed in 2001" when it enacted Oregon's statute. *Id.* at 623 n 12. California cases decided after 2001 are considered only for their "persuasive value." *Id.*

[17] The plaintiffs in *Navellier* had organized an investment fund; the defendant was one of the fund's trustees. After the defendant and other trustees terminated the corporate plaintiff's contract to provide investment advice and administrative services to the fund, the plaintiffs sued in federal court, alleging that the defendant had breached his fiduciary duties by terminating the contract, rejecting a merger that had been proposed, and failing to evaluate the consequences that those actions would have on shareholders. The parties then reached an agreement that reinstated the corporate plaintiff as the fund's investment advisor. That agreement included a broad release clause, in which the defendant released any claims he may have against the plaintiffs, but that did not end the litigation. The plaintiffs then filed an amended complaint in the federal court action; the defendant responded by filing counterclaims. The district court eventually granted summary judgment to the plaintiffs on some of the counterclaims—concluding that they were barred by the release provision in the parties' agreement—and rejecting the defendant's argument that the release was unenforceable. The case then proceeded to trial, and a jury returned a verdict in the defendant's favor. Both parties then appealed to the Ninth Circuit Court

the defendant's special motion to strike, and the California Court of Appeal affirmed, concluding that the case fell "outside the scope of the 'arising from' prong of the anti-SLAPP statute because it was not brought primarily to chill the exercise of constitutional free speech or petition rights and is not an abuse of the judicial process." 29 Cal 4th at 87, 52 P3d at 707 (describing the basis for the ruling of the Court of Appeal). The California Supreme Court reversed, concluding that the defendant had "met his threshold burden of demonstrating that [the] plaintiffs' action is one arising from the type of speech and petitioning activity that is protected by the anti-SLAPP statute." *Id.* at 95, 52 P3d at 713. Under the statute, that shifted the burden to the plaintiffs to establish a "probability of prevailing" on their claims. *Id.* Because the Court of Appeal had not considered whether the plaintiffs "ha[d] established a probability of prevailing," the California Supreme Court remanded the case to the Court of Appeal "to permit the court to address that question in the first instance." *Id.*

Thus, the court's broad statement that "a defendant who has validly contracted not to speak or petition *in effect* 'waived' the right to the anti-SLAPP statute's protection," *id.* at 94 (emphasis added), was not necessary to the court's decision. The court did not conclude that a contractual "waiver" relieved the plaintiffs of their burden of establishing a probability of prevailing on their claim, as required by California's anti-SLAPP statute. If it did, there would have been no reason to remand the case to allow the Court of Appeal to determine whether the plaintiffs had met their burden.

Accordingly, the California Supreme Court's broad statement about the "effect" of a valid contract not to speak or petition has no persuasive value in this case. Instead, we conclude—consistent with the California Supreme Court's holding in *Navellier*—that, because Thompson met her

---

of Appeals. While that appeal was pending, the plaintiffs sued the defendant in state court, alleging that he had committed fraud in misrepresenting that he intended to be bound by the release provision in the parties' agreement, and that he had breached the contract by filing counterclaims in federal court that challenged the validity of the release provision. The defendant responded by filing a special motion to strike the complaint under California's anti-SLAPP statute.

initial burden of establishing that Lowes's claim "arises out of" speech that is covered by subsection (2) of ORS 31.150, the Court of Appeals was required to determine whether the trial court erred in ruling that Lowes had not met his burden of establishing that he had a probability of prevailing on his claim, as required by subsections (1) and (4) of ORS 31.150.

The trial court evaluated the evidence that Lowes had submitted, concluded that the evidence was insufficient to meet Lowes's burden, and granted Thompson's special motion to strike. On review, the Court of Appeals did not determine whether the trial court had erred in evaluating the evidence, concluding instead that the nondisparagement clause alone defeated Thompson's special motion to strike. As we have explained, we reverse that decision and remand to the Court of Appeals to decide in the first instance whether the trial court erred in concluding that Lowes had not met his burden of establishing a probability of prevailing on his breach of contract claim.[18]

The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the Court of Appeals for further proceedings.

**JAMES, J.,** concurring.

This case concerns a nondisparagement clause of a contract that, at least according to defendant, precludes petitioner from publicly discussing or disclosing abuse. Our focus today is quite narrow—answering the limited question of whether the contract clause at issue waived the procedural right to utilize the anti-SLAPP statute. In light of the arguments presented by the parties, I concur in that approach. It was late in the litigation—only in briefing before us, not the lower courts—that appellant acknowledged the much more sweeping question that lurks in the background of this case: What are the public policy limitations, in Oregon, on contractual clauses, whether written in terms of nondisclosure or nondisparagement, that seek to prohibit speech on matters

---

[18] The concurring opinion suggests that the nondisparagement clause may be unenforceable in this context as contrary to public policy. We do not reach that issue because Thompson raised it for the first time in briefing to this court.

of abuse? I write separately to highlight the importance of that question, and the desire for legislative guidance.

As a test to be applied in determining whether a contract provision should be unenforceable as contrary to public policy, this court, in *Pyle v. Kernan*, 148 Or 666, 673-74, 36 P2d 580, 583 (1934), held that "[t]he test is the *evil tendency* of the contract and not its actual injury to the public in a particular instance." (Emphasis added.) *See also Restatement (Second) of Contracts* §§ 178-79 (1981) (listing various grounds for holding a contractual promise unenforceable on grounds of public policy, including legislation that is relevant to that policy); *Restatement* Introductory Note to ch 8 (explaining that, courts sometimes "will decide that the interest in freedom of contract is outweighed by some overriding interest of society and will refuse to enforce a promise or other term on grounds of public policy").

Contractual provisions that silence abuse victims may well meet the "evil tendency" standard of *Pyle*. It is certainly known that abusers use nondisparagement clauses to continue their abuse, sometimes over years. *See* Ronan Farrow, *Harvey Weinstein's Secret Settlements*, New Yorker Magazine, (Nov 21, 2017), https://www.newyorker.com/news/news-desk/harvey-weinsteins-secret-settlements (accessed Jul 15, 2025) ("Weinstein used nondisclosure agreements *** to evade accountability for claims of sexual harassment and assault for at least twenty years. He used these kinds of agreements with employees, business partners, and women who made allegations—women who were often much younger and far less powerful than Weinstein, and who signed under pressure from attorneys on both sides.")

And yet, for a court to declare a contract provision void as against public policy is to mount "a very unruly horse, and when you once get astride it you never know where it will carry you." Richard A. Lord, 5 *Williston on Contracts* § 12:3 (4th ed 2025). Although a court has the power to look to nonstatutory guideposts—constitutional provisions, common law, related regulation, etc.,—to determine whether a contractual provision should be void as against public policy, its task is made considerably easier if the legislature has weighed in on the issue.

In 2022, the United States Congress, in the Speak Out Act, found that

"\*\*\* [n]ondisclosure and nondisparagement provisions in agreements between employers and current, former, and prospective employees, and independent contractors, and between providers of goods and services and consumers, can perpetuate illegal conduct by silencing those who are survivors of illegal sexual harassment and assault or illegal retaliation, or have knowledge of such conduct, while shielding perpetrators and enabling them to continue their abuse.

"\*\*\* Prohibiting nondisclosure and nondisparagement clauses will empower survivors to come forward, hold perpetrators accountable for abuse, improve transparency around illegal conduct, enable the pursuit of justice, and make workplaces safer and more productive for everyone."

Pub L 117-224, § 2, 136 Stat 2290 (2022). Accordingly, Congress declared that, "[w]ith respect to a sexual assault dispute or sexual harassment dispute, no nondisclosure clause or nondisparagement clause agreed to before the dispute arises shall be judicially enforceable in instances in which conduct is alleged to have violated Federal, Tribal, or State law." Pub L 117-224, § 4, 136 Stat 2290. The Speak Out Act, however, does not reach the enforceability of all nondisclosure provisions.

State courts are seeing this issue litigated. In *Savage v. Township of Neptune*, 257 NJ 204, 313 A3d 65 (2024), the New Jersey Supreme Court recently considered whether a nondisparagement provision in a settlement agreement could preclude a police sergeant from talking to a reporter about her claims of discrimination, retaliation, and harassment against the police department. There, the court noted that the New Jersey legislature had enacted a statute that "removed barriers that previously made it difficult for individuals to report abuse." *Id*. at 209, 313 A3d at 68. Under that statute, the court explained, survivors of abuse "now have a legal right to tell their story—a right that cannot be taken away from them by a settlement agreement." *Id*. at 209, 313 A3d at 68. Thus, the court held that the nondisparagement clause in the agreement "is against public policy and cannot be enforced." *Id*. at 223, 313 A3d

at 77.[19] Other courts have declined to enforce broad nondisparagement clauses in divorce decrees as contrary to the parties' constitutional free speech rights, except where necessary to protect children to the marriage. *See, e.g.*, *Shak v. Shak*, 484 Mass 658, 144 NE3d 274 (2020); *Israel v. Israel*, 189 NE3d 170 (Ind Ct App), *transfer den*, 199 NE3d 789 (Ind 2022).

In related areas, the Oregon legislature has spoken. Private employers may not require their employees to sign employment contracts that include broad nondisclosure or nondisparagement provisions that would preclude the employees from disclosing or discussing discriminatory conduct. ORS 659A.370(1). Public and nonprofit employees enjoy broad "whistleblower" protection that precludes employers from taking disciplinary action against employees that disclose violations of state, federal or local laws. ORS 659A.203. The anti-SLAPP statute protects constitutional free speech, petition, and assembly rights in a variety of contexts, including a political candidate's right to speak to the press about issues of public interest. ORS 31.150(2)(a) - (d).

But on the issue of the enforceability of nondisclosure contract provisions to claims of abuse, the Oregon legislature has provided little guidance. I encourage it to do so, for the question left lurking from this case will surely be before us in the future.

I respectfully concur.

Bushong, J., joins in this concurring opinion.

---

[19] The Utah legislature in March 2024 amended its Antidiscrimination Act to provide that the application of nondisparagement clauses required as a condition of employment, are unenforceable in their ability to restrict speech alleging sexual misconduct. *See* Utah Code Ann § 34A-5-114 (2024). Likewise, California recently passed the Silenced No More Act which prohibits the use of confidentiality and nondisparagement agreements in the context of harassment, discrimination, and retaliation claims arising from an employment relationship. 2021 Cal Stat 8238.